IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF ILLINOIS and COOK COUNTY *ex rel.* MATTHEW BLAUM,<br><br>     Relator,<br><br>and HOT SHOTS NM, LLC,<br><br>     Plaintiff,<br><br>     v.<br><br>TRIAD ISOTOPES, INC., COVIDIEN INC., TODD GIBA, DONALD TREPASHKO, M.D., SAMI DISTIBUTORS, INC., SARAH SAMI, and FAISEL SAMI,<br><br>     Defendants. | 11CV8098<br>JUDGE HOLDERMAN<br>MAG. JUDGE FINNEGAN<br>)<br>) **FILED UNDER SEAL AND IN CAMERA**<br>)<br>)<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED**

NOV 1 4 2011

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**COMPLAINT**

NOW COMES the UNITED STATES OF AMERICA, the STATE OF ILLINOIS and

COOK COUNTY, ILLINOIS on relation of Relator MATTHEW BLAUM ("Blaum"), and

Plaintiff HOT SHOTS NM, LLC ("Hot Shots"), by and through their undersigned attorneys,

Loevy & Loevy, and complaining of Defendants TRIAD ISOTOPES, INC. ("Triad"),

COVIDIEN INC. ("Covidien"), TODD GIBA ("Giba"), DONALD TREPASHKO, M.D. ("Dr.

Trepashko"), SAMI DISTRIBUTORS, INC. ("Sami Distributors"), SARAH SAMI and FAISEL

SAMI (collectively, "Defendants"), state as follows:

**Nature of Case**

1.     As set forth below, since at least 2007 a handful of individuals and companies

have been engaged in a bid-rigging scheme designed to obtain lucrative contracts with the Cook

County Health and Hospitals System ("CCHHS") to meet Cook County's nuclear medicine

needs.  By this suit, Relator Blaum seeks to stop this ongoing fraud and to recover the monies

that Defendants have wrongfully obtained from CCHHS; Plaintiff Hot Shots seeks to put an end

to Defendants' anticompetitive conduct and to obtain compensation for injuries it suffered as a result of Defendants' antitrust violations.

2.      Relator Blaum brings *qui tam* claims against all Defendants pursuant to the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Illinois False Claims Act, 740 ILCS 175/1 *et seq.* Plaintiff Hot Shots brings antitrust claims against Defendants Triad, Sami Distributors, Giba, Dr. Trepashko, and Faisel and Sarah Sami pursuant to the federal Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, and the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, as well as a common law claim of tortious interference with contractual relations.

3.      Defendant Triad is a nationwide radiopharmaceutical company that operates radiopharmacies, and provides related radiopharmaceutical services, to hospital, clinics and other healthcare providers. Defendant Covidien is a global healthcare device and supply company with a radiopharmaceutical business that Triad acquired in 2009. The radiopharmaceutical field is commonly referred to as nuclear medicine. A radiopharmacy, also known as a nuclear pharmacy, compounds and distributes radiopharmaceuticals, which are used primarily in imaging procedures to diagnose medical problems. In addition to their diagnostic function, radiopharmaceuticals are also used in treating certain conditions such as hyperthyroidism, as well as some cancers and blood disorders.

4.      Since at least 2007, and through 2010, Covidien and Triad (after its acquisition of Covidien's radiopharmacies) ensured that they won annual contracts with CCHHS to provide radiopharmaceuticals by fraudulently using Defendant Sami Distributors, a minority-owned business entity ("MBE") owned and controlled by Defendants Sarah and Faisel Sami, as a pass-through.

5.      Defendant Dr. Trepashko is a Nuclear Radiologist employed by CCHHS, and has substantial control over the annual process by which CCHHS selects a winning bidder to meet its radiopharmaceutical needs in response to its requests for proposal ("RFP"). He worked with Defendant Todd Giba, a Nuclear Medicine Sales Representative at Covidien and now Triad's Chicago Sales Director, to ensure that Triad/Covidien won CCHHS's nuclear medicine contract

each year. Among other things, Dr. Trepashko advised Giba to use MBEs such as Sami
Distributors in order to gain an advantage in the bidding process, and provided Giba with
information about the RFP to ensure that Triad/Covidien's MBE pass-through, Sami
Distributors, won the contract. Giba, in turn, prepared the bid for Sami Distributors based on the
information Dr. Trepashko provided. In exchange, Giba lavished Dr. Trepashko with speaking
engagements that included honorariums and expensive dinners, worth thousands of dollars
annually, all paid for by Triad/Covidien.

6. Sami Distributors did indeed win the CCHHS nuclear medicine contract each year
from 2007 through 2010, which was worth more than $2 million annually. However, it
performed no services under the contract. Nor could it – Sami Distributors was not licensed by
the State of Illinois to sell, distribute or handle radioactive materials, a contract requirement
expressly set forth in the RFP. By nevertheless bidding on the contract, Sami Distributors
submitted false certifications to fraudulently obtain the contract. The other Defendants knew that
Sami Distributors did not have the required license, yet they encouraged Sami Distributors to
nevertheless bid on the CCHHS contract for Triad/Covidien's benefit.

7. These actions also constitute a fraud upon Cook County's Minority- and Women-
Owned Business Enterprise Ordinance ("MBE Program"), Cook County Ordinance § 34-271, *et
seq.* That Program, compliance with which is required pursuant to the Cook County Ordinances
and the RFPs at issue here, grants an advantage to MBE companies in order to promote the
County's goal of supporting the development and growth of historically-disadvantaged
companies. Defendants caused Sami Distributors to falsely certify that it could perform a
commercially useful function under the contract, thereby promoting the MBE Program's goals,
when in fact it could not.

8. In 2011, the process for obtaining the CCHHS nuclear medicine contract was
formalized through a bidding process managed by PricewaterhouseCoopers LLP. Plaintiff Hot
Shots participated in the bidding process for the first time in 2011. While Sami Distributors

again submitted a bid as a pass-through for Triad, this time Triad won the contract directly by rigging the bid process.

9.      Again, Dr. Trepashko provided information to Giba (now working for Covidien's successor-in-interest, Triad) in order to ensure that Triad won the bidding process. Specifically, Dr. Trepashko worked with Giba and Triad to alter the expected quantities of each radiopharmaceutical drug included in the RFP. For example, they increased in the RFP the expected quantity of certain radiopharmaceutical drugs far beyond the amount that would actually be used, and then Triad bid an extremely low price-per-unit (well below cost) for those drugs. By contrast, for drugs used regularly, Triad bid an extremely high price-per-unit. The extremely low bids on inflated quantities of rarely-used drugs allowed Triad to win the auction by presenting the lowest overall pricing; the high bids on regularly-used products ensured that Triad will earn out-sized profits while CCHHS will pay far more for its nuclear medicine needs than it would have if any of the legitimate companies bidding for the contract had won.

10.      Plaintiff Hot Shots had the second lowest overall bid, behind Triad's manipulated bid. By conspiring to rig the bid process in Triad's favor, Defendants (except Covidien) denied Hot Shots the CCHHS contract, as well as the profits and other benefits it would have obtained from the contract.

11.      Relator Blaum has knowledge of Defendants' use of pass-throughs and bid-rigging to obtain CCHHS contracts through two different avenues: 1) his experience as an employee of Covidien, where he worked under Defendant Giba during the 2007 bidding process; and 2) his role as an executive at Hot Shots, a nuclear medicine company competing against Defendants for the CCHHS contract in 2011, where he had access to information from individuals with knowledge of Triad's current and past contract performance and bidding efforts. Accordingly, Relator Blaum has personal knowledge of Defendants' fraudulent conduct, both as an insider and industry expert.

12.      The false statements and certifications made to obtain the annual CCHHS nuclear medicine contracts and the numerous false claims for payment under those ill-gotten contracts,

all violate the federal and state False Claims Acts. Pursuant to those laws, all Defendants are liable for treble damages, plus a penalty of $11,000 for every false claim and statement. Relator Blaum brings this action to recover damages suffered by the United States, the State of Illinois and the County of Cook, and to prevent future misconduct by Defendants.

13.     In addition, the agreement between the Defendants (excluding Covidien) to rig the 2011 bidding process in favor of Triad constitutes an improper restraint on trade in violation of federal and state antitrust laws, as well as tortious interference with contractual relations. Defendants committed such violations both by conspiring to set their bid prices so that Triad appeared to have the lowest overall bid, and by exchanging bidding information and secretly altering the RFP in order to manipulate the bid pricing,   Plaintiff Hot Shots brings this action to recover damages it suffered, including treble damages, as a result of Defendants' conduct.

### Jurisdiction and Venue

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under a federal statute, 31 U.S.C. § 3729, *et seq.* and 15 U.S.C. § 1, *et seq.*

15.     This Court has jurisdiction over Relator's and Plaintiff's state claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

16.     Venue is proper pursuant to 28 U.S.C. § 1391, as the Defendants may be found here and a substantial part of the conduct giving rise to the claims occurred here; and because Defendants transact business in this District, 31 U.S.C. § 3732(a).

17.     There has been no public disclosure of the fraud alleged herein. In addition, Relator is an original source of the information. Relator has direct and independent knowledge of the information on which the allegations are based and he voluntarily provided the information to the government before filing these claims.

### Parties

18.     Relator Blaum is a resident of the State of Illinois. He joined Covidien in 2007 and worked as a Nuclear Sales Specialist covering the Chicago market; in that position, he worked under Defendant Giba and gained personal knowledge of Defendants Giba and Dr.

5

Trepashko's efforts to secure the CCHHS contract for Covidien, and the financial incentives Triad provided to Dr. Trepashko to obtain the CCHHS contract through Sami Distributors. From 2008 to 2010, he worked for Covidien as an Account Manager in Michigan. Blaum left Covidien and joined Hot Shots in 2010, where he is currently the Director of Business Development.

19.     Plaintiff Hot Shots NM, LLC is a radiopharmaceutical company that competes directly with Triad in the nuclear pharmacy business. Hot Shots was founded by Curtis Blaum, the President and Chief Executive Officer, and Brian Blaum, the Chief Operating Officer.

20.     Defendant Covidien, Inc. is a global healthcare products company headquartered in Dublin, Ireland and with most corporate functions based in the Boston area. In addition to serving as a healthcare device and supply company, Covidien had a nuclear medicine division that operated almost 40 radiopharmacies in the United States. The radiopharmacies were sold to Defendant Triad in 2009.

21.     Defendant Triad Isotopes, Inc. is a nationwide radiopharmaceutical company based in Orlando, Florida. It operates more than 60 radiopharmacies around the country and has more than a thousand employees. In December 2009, Triad announced the acquisition of the radiopharmacy business of Covidien; the acquisition was completed in June 2010. Triad operates two radiopharmacies in the Chicago area.

22.     Defendant Todd Giba worked at Covidien as a Sales Representative since at least 2005. He had a long-standing relationship with Dr. Trepashko, and oversaw Triad's contracting efforts with CCHHS, including the use of Sami Distributors as a pass-through MBE. When Covidien was acquired by Triad in 2009, Giba joined Triad, where he continued to manage the relationship with CCHHS. He is currently employed at Triad as the Director of Sales for the Chicago area.

23.     Defendant Donald Trepashko, M.D., works for CCHHS as a Nuclear Radiologist. As the head of the Nuclear Medicine department at CCHHS, he has substantial control over the awarding of CCHHS's annual contract for nuclear medicine. He worked closely with Giba to

ensure that Triad/Covidien obtained the CCHHS contract indirectly through its MBE pass-through Sami Distributors, and later directly, in exchange for thousands of dollars in personal financial benefits.

24.     Defendant Sami Distributors, Inc. is an Illinois corporation located at 1150 Lexington Drive, Bartlett, IL 60103. It is certified by Cook County as a W/MBE company. Sami Distributors has had several small contracts with CCHHS to provide general medical supplies such as surgical and laboratory supplies, but it is not licensed to sell or distribute radiopharmaceuticals in the State of Illinois or any other state, and has no knowledge or experience in the field of nuclear medicine. Sami Distributors does not have an independent office or warehouse facility. The business address is the home of its owners, Sarah and Faisel Sami.

25.     Defendants Sarah Sami and Faisel Sami own, operate and control Sami Distributors, Inc. Sarah Sami is the President of Sami Distributors according to filings with the Illinois Secretary of State. The Samis worked closely with Giba to develop and submit bids through Sami Distributors in order to obtain the CCHHS radiopharmaceutical contracts.

26.     CCHHS, formerly known as the Cook County Bureau of Health Services, oversees a comprehensive, integrated system of healthcare throughout Chicago and suburban Cook County through its hospitals, ambulatory and community health network clinics, public health department, correctional healthcare facility, and outpatient infectious disease center. CCHHS is comprised of John H. Stroger Jr. Hospital, Provident Hospital, Oak Forest Hospital, Cook County Department of Public Health, Cermak Health Services, the Ruth Rothstein CORE Center, as well as sixteen Ambulatory and Community Health Network clinics. CCHHS receives a mix of County, State and Federal funding. In addition to County tax revenues, a substantial portion of CCHHS' funding comes from federal Medicaid and Disproportionate Share Hospital payments; those payments are made to the State, which administers the Medicaid and Disproportionate Share Hospital programs and distributes funds from those programs to CCHHS through the County.

7

**Facts**

**A.**     **Use of Sami Distributors as MBE Pass-Through from 2007 to 2010**

27.     Relator Blaum joined Covidien as a Sales Specialist in 2007, working under Giba. Blaum and Giba both reported to Dan Bradbury ("Bradbury"), a Regional Sales Manager. Blaum's job was to secure agreements with hospitals and other healthcare providers for the use of Covidien's radiopharmaceutical services.

28.     Almost immediately after Blaum joined Covidien, it began the process of trying to obtain the CCHHS contract for 2007. Giba led Covidien's efforts in the bidding process, but involved Blaum throughout the process with the expectation that he would eventually take over the account and future bidding efforts.

29.     In working with Giba, Blaum learned that Giba had a close relationship with Dr. Trepashko, and that Dr. Trepashko provided information to Giba about how to ensure that Triad obtained the contract. Among other things, Dr. Trepashko advised Giba to enlist MBEs to bid on the contracts as shell companies, in effect serving as a pass-through, through which Triad would obtain and perform the contract. Dr. Trepashko provided Giba with otherwise undisclosed information to assist Giba in preparing Triad's and its pass-through MBEs' bids for the radiopharmaceutical drugs in the RFP.

30.     Giba, in turn, implemented Dr. Trepashko's advice. He contacted Sami Distributors as well as two other MBE companies that also had small contracts to supply general medical supplies to CCHHS. He assisted those three companies in preparing bids for the CCHHS nuclear medicine contract, with the understanding that Covidien would provide all services under the contract and that the MBEs would receive a financial payment for serving as a pass-through.

31.     Covidien also submitted its own bid for the CCHHS contract. In this way, it had four opportunities to win the contract. Indeed, Giba prepared the bids for Covidien, Sami Distributors and the other MBE companies acting as a pass-through, inputting similar pricing for all four.

32.     Before the bids were due, Giba determined that Sami Distributors would be Covidien's preferred MBE company to win the CCHHS contract. Giba then took steps to ensure that Sami Distributors won the contract, which it did.

33.     Giba set up a meeting with Faisel Sami, which was also attended by Blaum. The meeting took place at the Samis' home, in an empty bedroom used as an office. At the meeting, Giba and Faisel Sami discussed Sami Distributors bidding for the CCHHS contract.

34.     After the meeting, Giba, Bradbury and Blaum met at a restaurant, where Giba took out the bidding forms he had prepared for Sami Distributors and the other MBEs and altered them. Specifically, the bidding forms contain a list of radiopharmaceutical drugs CCHHS uses and, based on the RFP, an expected quantity that CCHHS projected it would use annually for each drug. Each bidder provides a price per-dose for each drug; in combination with the expected quantities from the RFP, the total amount across all of the requested drugs forms the overall bid price. While the quantities of each drug actually used by CCHHS may vary, the winning bidder must charge the per-dose price for each drug in its bid. At the restaurant, Giba altered the bid prices in the MBEs' bidding forms so that Sami Distributors had the lowest price for one specific radiopharmaceutical product, leaving Sami Distributors the lowest overall bid of the MBE companies bidding on behalf of Covidien. Giba sent the revised application to Sami Distributors.

35.     Soon thereafter, Sami Distributors was awarded the CCHHS contract. However, Sami Distributors provided no commercially useful functions whatsoever. Instead, Covidien provided all nuclear medicine services under the contract. Indeed, Dr. Trepashko and other CCHHS staff ordering radiopharmaceutical drugs communicated directly with Covidien, and Covidien delivered the drugs directly to CCHHS.

36.     In exchange for steering the CCHHS contract to Covidien, Covidien rewarded Dr. Trepashko handsomely. Covidien set up speaking arrangements for Dr. Trepashko, at each of which he received honorariums worth $1,000 or more, as well as other gifts. Giba also regularly

took Dr. Trepashko out for lavish lunches and dinners at Covidien's expense, and on several occasions Bradbury and Giba instructed Blaum to do the same.

37. Occasionally, when Covidien did not provide Dr. Trepashko with gifts or other incentives for a period of several weeks or more, he would stop ordering radiopharmaceutical drugs from Covidien, filling his needs from other suppliers. Covidien would promptly provide gifts or other financial incentives, and its orders would immediately resume.

38. Sami Distributors' bid for the CCHHS contract, made at the behest of Covidien, was false and fraudulent. Among other things, the 2007 contract expressly required that the applicant "show documentation of a current license from the State of Illinois, Department of Nuclear Safety, Radioactive Material License pursuant to the Illinois Radiation Protection Act and Regulations for Radiation Protection." The contract further required that such license authorize the applicant to possess radiopharmaceuticals, and that the applicant maintain documentation that it maintained an active radiopharmaceutical quality control program and maintained its products and equipment in accordance with state regulations concerning radioactive materials. Sami Distributors met none of these requirements. Indeed, at the time of the 2007 bidding process, only three companies were licensed by the State of Illinois to provide radiopharmaceutical services in the Chicago area: Covidien, GE Healthcare, and Cardinal Health.

39. This certification was required in all future RFPs and bid proposals.

40. In addition, any claims for payment made under the contract by Sami Distributors, based on services actually performed by Covidien, were false and fraudulent.

41. In 2008, Blaum was transferred to Michigan and was no longer involved with the CCHHS account for Covidien.

42. When Triad acquired Covidien, it continued the fraud articulated above. Giba joined Triad and continued to work with Dr. Trepashko to ensure that Triad won the CCHHS contract. Indeed, Triad continued to provide services to CCHHS through Sami Distributors into 2011. In fact, Sami Distributors' one-year contract with CCHHS for the one-year period ending

in March 2011 was extended for an additional three months. That contract is worth approximately $2.7 million annually.

### B.     Use of Bid-Rigging to Secure 2011 Contract

43.     In 2010, Relator Blaum joined Hot Shots as the Director of Business Development. In that role, he was responsible for expanding Hot Shots' business by entering into contracts with healthcare providers to fill their radiopharmaceutical needs.

44.     In 2011, CCHHS put Pricewaterhouse Coopers LLP in charge of the bidding process for the radiopharmaceutical contract, and an online auction system run by Electronic Auction Services, Inc. was used to identify the low-cost bidder. While cost was not the only consideration in awarding the contract, it was the most important factor in obtaining the CCHHS contract.

45.     Shortly before the auction, Blaum received a call from Electronic Auction Services inviting Hot Shots to participate in the bidding process. Because Blaum knew that Triad engaged in fraudulent conduct to obtain the CCHHS contract, Hot Shots had not intended to bid for the CCHHS contract. However, having received the invitation, and based on the changes to the bidding process, Hot Shots decided to submit a bid.

46.     Once Hot Shots joined the bidding process, it immediately developed suspicions that Giba and Dr. Trepashko were still gaming the bidding process to Triad's advantage.

47.     Once again, Giba and Dr. Trepashko were altering the quantities requested in the RFP to Triad's benefit. Indeed, the quantities requested in the RFP for a number of the radiopharmaceuticals were inconsistent with the amounts generally used by CCHHS in the past. In addition, two of Hot Shots' radiopharmacists used to work for Triad while it was providing services to CCHHS under Sami Distributors' contract; they informed Blaum that the expected quantities in the RFP were not consistent with CCHHS's prior usage.

48.     One of the drugs included in the RFP was Bexxar, a rarely-used radiopharmaceutical drug that only a limited number of nuclear medicine companies were even

licensed to provide. A single dose of the drug costs approximately $35,000. The inclusion of Bexxar in the bid was unusual for several reasons:

      a.     First, CCHHS had not required Bexxar in past RFPs.

      b.     Second, shortly after the third party invitation to participate, Blaum called Dr. Trepashko to announce that Hot Shots was participating in the bidding process. Dr. Trepashko immediately asked whether Hot Shots could provide Bexxar; Blaum responded that Hot Shots could. Dr. Trepashko seemed surprised, and abruptly ended the call. The only two radiopharmacies in the Chicago area with rights to sell Bexxar are operated by Hot Shots and Triad, both currently and at that time. Based on the call, Blaum believed that Dr. Trepashko included Bexxar in the RFP because he mistakenly believed that Triad was the only company that could supply it, which would have made it easier to steer the contract to Triad.

      c.     Third, the RFP for Bexxar was ambiguous as to whether the amount requested was one dose or two. Specifically, the amount in the "Estimated Quantity" column was one, but in the text describing the name of the radiopharmaceutical drug requested, it stated "to include two (2) 5mCi Dosimetric, two (2) 250uCi Calibration source, two (2) therapeutic dose." These Bexxar components (one dose of each of the three is understood to constitute one "dose" of Bexxar) are not sold in sets of two, and thus to provide them as stated in the text would require bidding on two sets of doses of Bexxar, which would raise the bid by $35,000 or more.

49.     Relator Blaum and Curtis Blaum, Hot Shots' CEO, also began to receive unsolicited communications from a radiopharmacist for Triad informing them that Triad had rigged the bidding process. Among other things, the communications from the Triad pharmacist included details concerning the following:

      a.     Dr. Trepashko and Giba worked together to change the expected quantities for various drugs in the RFP to ensure that Triad would have the lowest overall bid in the auction, just as they had done in securing earlier contracts through Sami Distributors.

      b.     How Triad won the bidding process, including the exact prices Triad had bid for several radiopharmaceutical drugs for which its bid was far below cost, and others for

which its bid was extremely high. The ones far below cost were all drugs for which the expected quantities in the RFP seemed unusually high; the ones with extremely high bid prices were all drugs that are used frequently in radiopharmacies.

50.     After the bidding process was over and Triad had won the CCHHS contract, Blaum received a copy of the auction results, including the prices bid by each applicant for each drug. The results confirmed Blaum's suspicion of bid-rigging, and corroborated the information he received from Triad's pharmacist, including the exact prices the pharmacist said Triad had bid.

51.     The auction results made clear that Triad had won the auction by bidding extremely low on a few products that, because the expected quantity was inflated, generated the appearance of large savings to CCHHS. For example, Triad bid $20 per dose for Tc99 (WBC); Hot Shots and Cardinal Health, the only two legitimate bidders for the contract, bid $1,120 and $1,763.98 per dose, respectively. The quantity requested in the bid was 75 doses, when CCHHS' actual usage in prior years had been around 2-3 doses annually.[1] Similarly, for Sm-153 Quadramet 90 mCi, Triad bid $100 per dose; Hot Shots and Cardinal Health bid $5,250 and $7,301, respectively. Again, the quantity requested in the bid was 35, far more than the normal usage for that drug. The results created the false impression that choosing Triad would generate large savings to CCHHS.

52.     The auction results also confirmed that Triad's bids on regularly-used drugs were far higher than its competitors, which meant that based on actual drug usage, CCHHS would end up paying far more to Triad under the contract than it would have paid to Hot Shots or Cardinal. For example, for Tc99m Sestamibi, Triad bid $68, while Hot Shots bid $40, a price in line with the amount Hot Shots, Triad and other radiopharmacies charged to other hospitals. Because the actual usage of this drug is more than 2,000 doses annually, CCHHS will pay Triad far more

---

[1] CCHHS' actual usage of TC 99 (WBC) was low because it used a competing product that served the same purpose, Indium 111 WBC. CCHHS did not appear to have any intention of switching products, since the RFP included an expected quantity of 50 doses of Indium 11 WBC.

than it would have paid Hot Shots. Similarly, for TL-201 4 mCi, Triad bid $20 per millicurie, while Hot Shots bid $15. Because the bid estimates that each dose will require an average of four millicurie, the dose prices bid by Triad and Hot Shots were $80 and $60, respectively. The expected quantity of this drug used annually is also over 2,000 doses.

53.     The auction results also show that Sami Distributors and the other MBE company Triad used as a pass-through still submitted bids for the CCHHS contract despite lacking the requisite license to perform such services. Triad used these pass-throughs to gain control over the bidding process and to mask its anomalous bid pricing.

54.     Through the foregoing, Triad won the auction with the lowest overall pricing. On May 26, 2011, the Board of CCHHS approved the Triad contract for one year, from July 1, 2011 to June 30, 2012, at an anticipated cost of $1.6 million. Because of Defendants' bid-rigging; in particular, its phantom savings on rarely-used drugs and inflated prices on the most commonly-used radiopharmaceuticals, the actual cost to CCHHS of the Triad contract will be far greater.

55.     In addition, through the foregoing, Defendants (except Covidien) conspired to prevent Hot Shots, which had the lowest overall bid among the legitimate bidders, from winning the CCHHS contract.

## The False Claims

56.     By all of the above, Defendants made and caused to be made material false claims in order to obtain the CCHHS contracts, and receive payments under those contracts, to which they were not entitled.

### *False Certifications*

57.     First, Defendants caused Sami Distributors to falsely certify that it met certain licensure and regulatory requirements concerning the handling of radiopharmaceuticals, which were a prerequisite to bidding on and obtaining the CCHHS radiopharmaceutical contracts.

        a.      As a condition of bidding on, and of the award of, each contract, the RFP required, *inter alia*, that the bidder maintain a license from the Illinois Department of Nuclear Safety and meet various regulatory requirements concerning the handing, transport, delivery and

14

tracking of radiopharmaceutical drugs. Defendants Sami Distributors, Sarah Sami and Faisel Sami falsely certified and represented in their bid proposals for the CCHHS contracts that they met the licensing and regulatory requirements when, in fact, they did not. Defendants Covidien, Triad, Giba and Dr. Trepashko participated in this fraud by causing Sami Distributors and causing it to submit bids knowing that it did not have the required license or the knowledge, experience or expertise to perform the contract in accordance with the regulations concerning the handling of radiopharmaceutical drugs.

58. Second, Defendants caused Sami Distributors to falsely certify that it was a qualified MBE for the CCHHS radiopharmaceutical contract under Cook County's MBE Program, compliance with which is a prerequisite to obtaining the contract.

a. Defendants took advantage of Cook County's MBE Program by using Sami Distributors' MBE certification to win contracts for Covidien and Triad. The RFPs for the CCHHS radiopharmaceutical contract require compliance with the MBE Program. Cook County Ordinances require the County to try to award not less than 35% of the annual total dollar amount of contracts to qualified W/MBEs. However, for Sami Distributors' MBE status to be used legitimately to win contracts as a prime contractor or joint venture partner, it had to perform "commercially useful function." See Cook County Ordinance § 34-277 (b)(3)(a) and (d). "Commercially useful function" means the following:

> [T]he performance of real and actual services in the discharge of any contractual endeavor. The contractor must perform a distinct element of work which the business has the skill and expertise to perform and have the responsibility of actually performing, managing and supervising such element of work.

> See Cook County Ordinance § 34-273.

b. Even to qualify as a supplier, Sami Distributors must own or operate a warehouse and related distribution equipment and maintain "consistent with industry standards, an inventory of the materials or supplies required for performance of the contract for sale in the normal course of business." See Cook County Ordinance § 34-277(b)(3)(c).

c.      Sami Distributors did not and could not perform a commercially useful function on the CCHHS radiopharmaceutical contracts, and had no knowledge or experience whatsoever regarding the possession, delivery or use of radiopharmaceuticals; in addition, it did not maintain an inventory of the materials required to perform the contract. Accordingly, it could not serve as an MBE-qualified contractor, joint venture partner or supplier for the CCHHS contracts at issue herein. Its certification that it was a qualified MBE that could be awarded the contract in accordance with the MBE Program's W/MBE participation goals was knowingly false.

59.      Third, the Defendants caused Sami Distributors, Covidien and Triad to falsely certify that they were in compliance with all federal, state and local laws and regulations concerning the preparation of the bid proposal and the performance of the contract, which was a prerequisite to bidding on and obtaining the CCHHS radiopharmaceutical contracts.

a.      The RFP required bidders to certify that they would "at all times observe and comply with all laws, ordinances, regulations, and codes of the Federal, State, County and other local government agencies which may in any manner effect the preparation of the Bid Proposal or the performance of the contract." As discussed above, Defendants conspired to rig the bidding process, thereby unlawfully restraining trade or commerce, in violation of federal and state antitrust laws. Defendants' certifications that they were in compliance with federal and state laws concerning the bidding process were therefore knowingly false.

60.      Through these false certifications and representations, Defendants fraudulently induced CCHHS to award contracts to Sami Distributors – and to Triad directly in 2011 – that they knew would be performed by, and for the benefit of, Covidien and Triad. Each Defendant benefitted financially from these fraudulently-induced contracts.

*Other False Claims*

61.      The bids submitted by Defendants Covidien, Triad and Sami Distributors from 2007 through 2010 also constitute false claims. The CCHHS contracts awarded each year to Sami Distributors for the benefit of Covidien and Triad, in which Sami Distributors served as a

16

mere pass-through, were obtained by fraud. Accordingly, the bids submitted to obtain these contracts constitute false claims and/or false statements material to false claims.

62. Similarly, the bids submitted by Defendants Triad and Sami Distributors to ensure that Triad won the 2011 CCHHS contract constitute false claims and/or false statements material to false claims. Indeed, the 2011 CCHHS contract awarded to Triad was also obtained by fraud. Rather than allow the contract to be awarded through a fair and open bidding process, Defendants Triad, Giba and Dr. Trepashko caused the RFPs to be altered to Triad's advantage and then made and caused to be made bid proposals that ensured Triad obtained the contract under terms that, unbeknownst to CCHHS, would cost it substantially more than competing bids.

63. After obtaining the contracts, Defendants caused to be submitted false claims for payment to CCHHS for work performed on the fraudulently-obtained contracts.

64. Furthermore, the bid submissions and claims for payment to CCHHS constitute false claims for the additional reason that they contained inflated pricing based on the incorporation of costs of fraud-related kickbacks paid among the Defendants and based on Defendants' use of insider information about the bid process to submit higher bids than they would have submitted in competition.

65. Defendants engaged in these fraudulent actions knowingly, and with personal knowledge that the statements and claims submitted were false.

### Count I - Federal False Claims Act Regarding Sami Distributors Contracts By Relator Blaum Against All Defendants

66. Relator incorporates each of the paragraphs of this complaint as if fully set forth herein.

67. Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval concerning the 2007 through 2010 CCHHS contracts awarded to Sami Distributors, in violation of 31 U.S.C. § 3729(a)(1)(A).

68. Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim

concerning the 2007 through 2010 CCHHS contracts awarded to Sami Distributors, in violation of 31 U.S.C. § 3729(a)(1)(B).

69.     Through the above-described conduct, Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) or (B) concerning the 2007 through 2010 CCHHS contracts awarded to Sami Distributors, in violation of 31 U.S.C. § 3729(a)(1)(C).

70.     Defendants, and each of them, acted with knowledge of the falsity as that term is defined in the federal False Claims Act.

WHEREFORE, Relator Blaum respectfully demands:

A.     Judgment in favor of himself and the United States of America and against Defendants, jointly and severally, in the amount of $11,000 for each false claim and false statement that Defendants submitted, together with treble the amount of payment received and/or costs avoided;

B.     Judgment awarding Relator 30% of any recovery;

C.     Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D.     Any other relief to which Relator may appear entitled.

### Count II - State False Claims Act Regarding Sami Distributors Contracts By Relator Blaum Against All Defendants

71.     Relator incorporates each of the paragraphs of this complaint as if fully set forth herein.

72.     Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval concerning the 2007 through 2010 CCHHS contracts awarded to Sami Distributors, in violation of 740 ILCS 175/3(a)(1)(A).

73.     Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim concerning the 2007 through 2010 CCHHS contracts awarded to Sami Distributors, in violation of 740 ILCS 175/3(a)(1)(B).

74.     Through the above-described conduct, Defendants conspired to commit a violation of 740 ILCS 175/3(a)(1)(A) or (B) concerning the 2007 through 2010 CCHHS contracts awarded to Sami Distributors, in violation of 740 ILCS 175/3(a)(1)(C).

75.     Defendants, and each of them, acted with knowledge of the falsity as that term is defined in the Illinois False Claims Act.

WHEREFORE, Relator Blaum respectfully demands:

A.      Judgment in favor of himself and the State of Illinois and the County of Cook, and against Defendants, jointly and severally, in the amount of $11,000 for each false claim and false statement that Defendants submitted, together with treble the amount of payment received and/or costs avoided;

B.      Judgment awarding Relator 30% of any recovery;

C.      Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D.      Any other relief to which Relator may appear entitled.

### Count III - Federal False Claims Act Regarding 2011 Triad Contract By Relator Blaum Against All Defendants (Except Covidien)

76.     Relator incorporates each of the paragraphs of this complaint as if fully set forth herein.

77.     Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval concerning the 2011 CCHHS contract awarded to Triad, in violation of 31 U.S.C. § 3729(a)(1)(A).

78.     Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim concerning the 2011 CCHHS contract awarded to Triad, in violation of 31 U.S.C. § 3729(a)(1)(B).

79. Through the above-described conduct, Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) or (B) concerning the 2011 CCHHS contract awarded to Triad, in violation of 31 U.S.C. § 3729(a)(1)(C).

80. Defendants, and each of them, acted with knowledge of the falsity as that term is defined in the federal False Claims Act.

WHEREFORE, Relator Blaum respectfully demands:

A. Judgment in favor of himself and the United States of America and against Defendants, jointly and severally, in the amount of $11,000 for each false claim and false statement that Defendants submitted, together with treble the amount of payment received and/or costs avoided;

B. Judgment awarding Relator 30% of any recovery;

C. Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D. Any other relief to which Relator may appear entitled.

## Count IV - State False Claims Act Regarding 2011 Triad Contract By Relator Blaum Against All Defendants (Except Covidien)

81. Relator incorporates each of the paragraphs of this complaint as if fully set forth herein.

82. Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval concerning the 2011 CCHHS contract awarded to Triad, in violation of 740 ILCS 175/3(a)(1)(A).

83. Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim concerning the 2011 CCHHS contract awarded to Triad, in violation of 740 ILCS 175/3(a)(1)(B).

84. Through the above-described conduct, Defendants conspired to commit a violation of 740 ILCS 175/3(a)(1)(A) or (B) concerning the 2011 CCHHS contract awarded to Triad, in violation of 740 ILCS 175/3(a)(1)(C).

85. Defendants, and each of them, acted with knowledge of the falsity as that term is defined in the Illinois False Claims Act.

WHEREFORE, Relator Blaum respectfully demands:

A. Judgment in favor of himself and the State of Illinois and the County of Cook, and against Defendants, jointly and severally, in the amount of $11,000 for each false claim and false statement that Defendants submitted, together with treble the amount of payment received and/or costs avoided;

B. Judgment awarding Relator 30% of any recovery;

C. Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D. Any other relief to which Relator may appear entitled.

### Count V - Sherman Antitrust Act Regarding 2011 Triad Contract By Plaintiff Hot Shots Against All Defendants (Except Covidien)

86. Plaintiff incorporates each of the paragraphs of this Complaint as if fully set forth herein.

87. Through the above-described conduct, Defendants entered into a conspiracy resulting in an unreasonable restraint of trade or commerce, in violation of 15 U.S.C. § 1.

88. Defendants conspired to restrain trade by suppressing competition and depriving Plaintiff Hot Shots and other legitimate radiopharmaceutical service providers in the Chicago-area market a fair and competitive bid process, and thereby generating inflated profits for Defendants at greater expense to CCHHS.

89. Defendants further conspired to restrain trade by exchanging and sharing non-public information about the RFP, including deliberate manipulations made to the RFP for the

benefit of Defendants, and about the pricing in Defendants' bid submissions for the CCHHS contract.

90.     Pursuant to their unlawful conspiracy, Defendants have reduced competition among providers of radiopharmaceutical services in the Chicago-area market by preventing legitimate low-cost bidders such as Plaintiff from competing equally for the CCHHS radiopharmaceutical contract and thereby depriving them of the opportunity to win the contract.

91.     Plaintiff Hot Shots suffered substantial economic harm to its business or property as a result of Defendants' unlawful conduct, including the denial of a lucrative contract with CCHHS and lost profits therefrom. Such injury is of the type the antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

92.     The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce. Among other things, Plaintiff Hot Shots and Defendants Triad and Covidien provide radiopharmaceutical services in various states; many of the radiopharmaceutical drugs at issue in the RFPs are manufactured in various states and/or transported across state lines; and the CCHHS funds used to pay Defendants for radiopharmaceutical drugs include Medicaid and Disproportionate Share Hospital funds obtained from the United States and mailed and/or transferred across state lines.

WHEREFORE, Plaintiff Hot Shots respectfully demands:

A.     Judgment in favor of itself against Defendants (except Covidien), jointly and severally, together with treble the amount of damages sustained;

B.     Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action;

C.     Judgment awarding prejudgment interest; and

D.     Any other relief to which Plaintiff may appear entitled.

### Count VI - Illinois Antitrust Act Regarding 2011 Triad Contract
### By Plaintiff Hot Shots Against All Defendants (Except Covidien)

93.     Plaintiff incorporates each of the paragraphs of this Complaint as if fully set forth herein.

94.     Through the above-described conduct, Defendants entered into a conspiracy with a competitor, in violation of 740 ILCS 10/3.

95.     Through the above-described conduct, Defendants entered into a conspiracy with one or more other persons resulting in an unreasonable 0 of trade or commerce, in violation of 740 ILCS 10/3.

96.     Plaintiff Hot Shots suffered substantial economic harm to its business or property as a result of Defendants' unlawful conduct, including the denial of a lucrative contract with CCHHS and lost profits therefrom.  Such injury is of the type the antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

97.     Defendants' violations were willful.

98.     The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce, and has an impact in Illinois and affects the State, its political subdivisions, businesses and consumers.

WHEREFORE, Plaintiff Hot Shots respectfully demands:

A.      Judgment in favor of itself against Defendants (except Covidien), jointly and severally, together with treble the amount of damages sustained;

B.      Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action;

C.      Judgment awarding prejudgment interest; and

D.      Any other relief to which Plaintiff may appear entitled.

### Count VII - Tortious Interference With Prospective Business Opportunity
### By Plaintiff Hot Shots Against All Defendants (Except Covidien)

99.     Plaintiff incorporates each of the paragraphs of this Complaint as if fully set forth herein.

100.    As set forth above, Plaintiff Hot Shots had a reasonable expectation of entering into a valid business relationship with CCHHS. Defendants had knowledge of that expectation.

101.    Through the above-described conduct, Defendants purposefully interfered to prevent Plaintiff Hot Shots' legitimate expectancy from ripening into a valid business relationship.

102.    Plaintiff Hot Shots suffered damages as a result of Defendants' purposeful interference.

103.    Defendants' actions were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights.

WHEREFORE, Plaintiff Hot Shots respectfully demands:

A.    Judgment in favor of itself against Defendants (except Covidien), jointly and severally, awarding compensatory damages, along with punitive damages.

B.    Any other relief to which Plaintiff may appear entitled.

## JURY DEMAND

The United States of America, the State of Illinois and the County of Cook, on relation of

Matthew Blaum, and Plaintiff Hot Shots, hereby demand trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

One of Counsel for Plaintiffs

Arthur Loevy
Jon Loevy
Dan Twetten
Anand Swaminathan
LOEVY & LOEVY
312 N. May Street, Suite 100
Chicago, Illinois 60607
(312) 243-5900

Garry Barker
BARKER LAW OFFICES
203 N. La Salle Street, Suite 2100
Chicago, IL 60601