IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| United States of America, State of Illinois, and Cook County, *ex rel.* Matthew Blaum, ) | |
| Relator, ) | |
| and Hot Shots NM, LLC, ) | Case No. 11-cv-8098 |
| Plaintiff, ) | Hon. Robert M. Dow |
| v. ) | Jury Trial Demanded |
| Triad Isotopes, Inc., Covidien, Inc., Todd Giba, Donald Trepashko, M.D., Sami Distributors, Inc., Sarah Sami, and Faisel Sami, ) | |
| Defendants. ) | |

## Amended Complaint

Now come the Unites States of America, the State of Illinois, and Cook County, Illinois, on relation of Relator Matthew Blaum ("Blaum"), and Plaintiff Hot Shots NM, LLC ("Hot Shots"), by and through their attorneys, and complaining of Defendants Triad Isotopes, Inc. ("Triad"), Covidien, Inc. ("Covidien"), Todd Giba ("Giba"), Donald Trepashko, M.D. ("Dr. Trepashko"), Sami Distributors, Inc., Sarah Sami, and Faisel Sami, state as follows:

### Nature of Case

1. From at least 2008 through at least 2011, Defendants defrauded Cook County and the Cook County Health and Hospitals System ("CCHHS") by making false statements and false claims regarding radiopharmaceuticals. By this suit, Relator Blaum seeks to recover the monies that Defendants have wrongfully

obtained; Plaintiff Hot Shots seeks compensation for injuries it suffered as a result of Defendants' antitrust violations.

2. Each year, CCHHS purchases about $2 million worth of radiopharmaceuticals. These drugs are used to treat certain conditions such as cancer and to perform radiological testing such as CT scans and MRIs.

3. From at least 2008 through 2010, Defendant Sami Distributors held the exclusive contract to provide radiopharmaceuticals to CCHHS. However, Sami Distributors served merely as a pass-through. The real provider of the radiopharmaceuticals was Covidien (and later Triad, after Triad bought Covidien's radiopharmaceutical business). The key relationship was between Giba and other Covidien sales personnel, on the one hand, and Dr. Trepashko, on the other hand. Dr. Trepashko controlled the radiopharmaceutical contract at CCHHS. As Dr. Trepashko stated to Blaum in 2012, Dr. Trepashko makes the final decision about where CCHHS purchases radiopharmaceuticals. Giba and other Covidien personnel managed the CCHHS account as if they owned the contract. Dr. Trepashko understood this well, and took frequent advantage of the relationship through lavish dinners, honorariums, and other benefits.

4. At Dr. Trepashko's urging, Giba and Covidien begin working hand-in-glove with Sami Distributors. Giba understood that Dr. Trepashko wished for Sami Distributors to hold the CCHHS contract. To satisfy this wish, Giba and Covidien prepared Sami Distributors' bid for the CCHHS contract and then arranged with Sami Distributors to act as a pass-through for years.

5. The CCHHS radiopharmaceutical contract requires that Sami Distributors itself store, maintain, and deliver the drugs that CCHHS ordered. Further, the contract requires that Sami Distributors hold a license to provide radiopharmaceuticals. In fact, at no time did Sami Distributors have such a license. Sami Distributors has never had a warehouse or other means of storing or delivering the radiopharmaceuticals used by CCHHS. In fact, other than serving as a pass-through on the CCHHS contract, Sami Distributors has never been involved in the radiopharmaceutical business.

6. Instead of being a legitimate provider of radiopharmaceuticals, Sami Distributors was a pure pass-through entity. Dr. Trepashko and the other physicians at CCHHS ordered their radiopharmaceuticals directly from Covidien's pharmacies, and Covidien delivered those radiopharmaceuticals directly to CCHHS. Sami Distributors played no role whatsoever in the provision of this medicine.

7. Sami Distributors also misrepresented its compliance with Cook County's requirement that 35 percent of contract funds be spent with minority- or woman-owned business entities ("M/WBEs"). Sami Distributors promised to spend 35 percent of the radiopharmaceutical dollars with M/WBEs when, in fact, nearly 100 percent of the radiopharmaceutical dollars went directly to Covidien pursuant to Sami Distributors' agreement to be a pass-through for Covidien.

8. In 2011, the game changed. At that time, CCHHS initiated an online auction for the radiopharmaceutical contract.

9. Acting through Dr. Trepashko, Triad manipulated the quantities of certain drugs that CCHHS indicated would be needed in the auction. Basically, Triad inflated the number of certain drugs far beyond what CCHHS would ever use and then bid very low prices for those drugs. As a result of this bid-rigging, Triad's total bid was lowest and Triad secured the 2011 radiopharmaceutical contract. Plaintiff Hot Shots provided the second-lowest bid. If the volumes used in the bid process reflected reality instead of Triad's bid-rigging, CCHHS would have saved more than $300,000 per year through Hot Shots' bid.

## **Jurisdiction and Venue**

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under a federal statute, 31 U.S.C. § 3729, *et seq.* and 15 U.S.C. § 1, *et seq.*

11. This Court has jurisdiction over Relator's and Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

12. Venue is proper pursuant to 28 U.S.C. § 1391, as the Defendants may be found here and a substantial part of the conduct giving rise to the claims occurred here; and because Defendants transact business in this District, 31 U.S.C. § 3732(a).

13. There has been no public disclosure of the fraud alleged herein. In addition, Relator is an original source of the information. Relator has direct and independent knowledge of the information on which the allegations are based and

he voluntarily provided the information to the government before filing these claims.

## Parties

14. Relator Blaum is a resident of the State of Illinois. He joined Covidien in 2007 and worked as a Nuclear Sales Specialist covering the Chicago market; in that position, he worked under Defendant Giba and gained personal knowledge of Giba and Dr. Trepashko's efforts to secure the CCHHS contract for Covidien through the pass-through arrangement with Sami Distributors. From 2008 to 2010, Relator Blaum worked for Covidien as an Account Manager in Michigan. Blaum left Covidien and joined Hot Shots in 2010, where he served as Director of Business Development until 2013.

15. Plaintiff Hot Shots NM, LLC is a radiopharmaceutical company that competes directly with Triad in the nuclear pharmacy business. Hot Shots was founded by Curtis Blaum, the President and Chief Executive Officer, and Brian Blaum, the Chief Operating Officer.

16. Defendant Covidien, Inc. is a global healthcare products company headquartered in Dublin, Ireland, and with most corporate functions based in the Boston area. In addition to serving as a healthcare device and supply company, Covidien had a nuclear medicine division that operated almost 40 radiopharmacies in the United States. The radiopharmacies were sold to Defendant Triad in a deal announced in 2009 and completed in 2010. In June 2014, Minneapolis-based

Medtronic, Inc. agreed to purchase Covidien in a transaction that is expected to close in late 2014 or early 2015.

17. Defendant Triad Isotopes, Inc. is a nationwide radiopharmaceutical company based in Orlando, Florida. It operates more than 60 radiopharmacies around the country and has more than a thousand employees. In December 2009, Triad announced the acquisition of the radiopharmacy business of Covidien; the acquisition was completed in June 2010. Triad operates two radiopharmacies in the Chicago area.

18. Defendant Todd Giba worked at Covidien as a Sales Representative since at least 2005. He had a long-standing relationship with Dr. Trepashko and oversaw Triad's contracting efforts with CCHHS, including the use of Sami Distributors as a pass-through. When Triad acquired Covidien in 2010, Giba joined Triad, where he continued to manage the relationship with CCHHS through at least 2012.

19. Defendant Donald Trepashko, M.D., works for CCHHS as a Nuclear Radiologist. As the head of the Nuclear Medicine department at CCHHS, he has substantial control over the awarding of CCHHS's annual contract for nuclear medicine. He worked closely with Giba to ensure that Triad/Covidien obtained the CCHHS contract indirectly through its pass-through Sami Distributors, and later directly, in exchange for thousands of dollars in personal financial benefits.

20. Defendant Sami Distributors, Inc., is an Illinois corporation located in Bartlett, Illinois. Sami Distributors has had several small contracts with CCHHS to

provide general medical supplies such as surgical and laboratory supplies, but it is not licensed to sell or distribute radiopharmaceuticals in the State of Illinois or any other state, and has no knowledge or experience in the field of nuclear medicine. Sami Distributors does not have an independent office or warehouse facility.

21. Defendants Sarah Sami and Faisel Sami own, operate and control Sami Distributors, Inc. Sarah Sami is the President of Sami Distributors according to filings with the Illinois Secretary of State. The Samis worked closely with Giba to develop and submit bids through Sami Distributors in order to obtain the CCHHS radiopharmaceutical contracts.

22. CCHHS, formerly known as the Cook County Bureau of Health Services, oversees a comprehensive, integrated system of healthcare throughout Chicago and suburban Cook County through its hospitals, ambulatory and community health network clinics, public health department, correctional healthcare facility, and outpatient infectious disease center. CCHHS is comprised of John H. Stroger Jr. Hospital, Provident Hospital, Oak Forest Hospital, Cook County Department of Public Health, Cermak Health Services, the Ruth Rothstein CORE Center, as well as sixteen Ambulatory and Community Health Network clinics. CCHHS annual revenues exceed $900 million. The majority of that revenue comes from payments for services, including payments from the Medicare and Medicaid programs. Approximately 39 percent of CCHHS's patient revenue comes from Medicare and Medicaid. Because CCHHS serves all patients, it has a substantial shortfall each year between its expenses and the revenue generated by

patient care. This shortfall is made up by the County directly. In 2011, for example, the County provided CCHHS approximately $368 million to make up for its shortfall.

## Facts

A. Use of Sami Distributors as a Pass-Through

23. Relator Blaum joined Covidien as a Sales Specialist in 2007, working under Giba. Blaum and Giba both reported to Dan Bradbury ("Bradbury"), a Regional Sales Manager. Blaum's job was to secure agreements with hospitals and other healthcare providers for the use of Covidien's radiopharmaceutical services.

24. Covidien sought to obtain the CCHHS contract for 2008. Giba led Covidien's efforts in the bidding process, but involved Blaum throughout the process with the expectation that he would eventually take over the account and future bidding efforts.

25. In working with Giba, Blaum learned that Giba had a close relationship with Dr. Trepashko, and that Dr. Trepashko provided information to Giba about how to ensure that Covidien obtained the contract. In particular, Dr. Trepashko told Giba that he wanted Sami Distributors to win the contract and act as a pass-through for Covidien. Dr. Trepashko provided Giba with otherwise undisclosed information to assist Giba in preparing Triad's and its pass-through MBEs' bids for the radiopharmaceutical drugs in the RFP.

26. From the outset of their relationship, Dr. Trepashko, Giba, Covidien (and later, Triad), and Sami Distributors agreed to defraud the government through

their conspiracy. In fact, in 2012, Dr. Trepashko stated directly to Blaum that Dr. Trepashko did not care what happened to the money or how much the drugs cost; it was CCHHS's money, not his.

27. To execute the plan, Giba contacted Sami Distributors as well as two other MBE companies that also had small contracts to supply general medical supplies to CCHHS. He assisted those three companies in preparing bids for the CCHHS nuclear medicine contract, with the understanding that Covidien would provide all services under the contract and that the MBEs would receive a financial payment for serving as a pass-through.

28. Before the bids were due, Dr. Trepashko determined that Sami Distributors would be the preferred pass-through company to win the CCHHS contract. Giba then took steps to ensure that Sami Distributors won the contract, which it did.

29. Giba set up a meeting with Faisel Sami, which was also attended by Blaum. The meeting took place at the Samis' home, in an empty bedroom used as an office. At the meeting, Giba and Faisel Sami discussed Sami Distributors bidding for the CCHHS contract.

30. After the meeting, Giba, Bradbury, and Blaum met at a restaurant, where Giba took out the bidding forms he had prepared for Sami Distributors and the other M/WBEs and altered them. Specifically, the bidding forms contain a list of radiopharmaceutical drugs CCHHS used and, based on the RFP, an expected quantity that CCHHS projected it would use annually for each drug. Each bidder

provided a price per-dose for each drug; in combination with the expected quantities from the RFP, the total amount across all of the requested drugs forms the overall bid price. While the quantities of each drug actually used by CCHHS may vary, the winning bidder must charge the per-dose price for each drug in its bid. At the restaurant, Giba altered the bid prices in the M/WBEs' bidding forms so that Sami Distributors had the lowest price for one specific radiopharmaceutical product, leaving Sami Distributors the lowest overall bid of the MBE companies bidding on behalf of Covidien. Giba sent the revised application to Sami Distributors.

31. Soon thereafter, Sami Distributors was awarded the CCHHS contract. However, Sami Distributors provided no commercially useful functions whatsoever. Instead, Covidien provided all nuclear medicine services under the contract. Indeed, Dr. Trepashko and other CCHHS staff ordering radiopharmaceutical drugs communicated directly with Covidien, and Covidien delivered the drugs directly to CCHHS.

32. In exchange for steering the CCHHS contract to Covidien, Covidien rewarded Dr. Trepashko handsomely. Covidien set up speaking arrangements for Dr. Trepashko, at each of which he received honorariums worth $1,000 or more, as well as other gifts. Giba also regularly took Dr. Trepashko out for lavish lunches and dinners at Covidien's expense, and on several occasions Bradbury and Giba instructed Blaum to do the same.

33. Occasionally, when Covidien did not provide Dr. Trepashko with gifts or other incentives for a period of several weeks or more, he would stop ordering

radiopharmaceutical drugs from Covidien, filling his needs from other suppliers. Covidien would promptly provide gifts or other financial incentives, and its orders would immediately resume.

34. Sami Distributors' response to the CCHHS request for proposal was made on August 11, 2008. By the terms of the request for proposal itself, Sami Distributors' response became the contract between Sami and CCHHS on December 5, 2008, when CCHHS approved Sami Distributors' August 11, 2008 proposal.

35. Sami Distributors made several false and fraudulent statements in its August 11, 2008 proposal, including promising to:

> maintain "Inventory stocking allowing SAME DAY SERVICE"; provide "24 HOURS EMERGENCY SERVICE, delivery within one (1) hour of request"; provide "Material Safety Data Sheet binders and updates on all Radioisotopes specified herein"; "meet the requirements for the transport or delivery of radioactive material in accordance with the provisions of Part 341 of 32 Illinois Administrative Code"; "pick-up the expended radioactive syringes"; "show documentation of a current license from the State of Illinois, Department of Nuclear Safety, Radioactive Material License pursuant to the Illinois Radiation Protection Act and Regulations for Radiation Protection"; and "show documentation of License that authorized them to receive, acquire, own, possess, and transfer radioactive materials required by the Hospital."

36. Each and every one of these promises and statements was false and fraudulent. Sami Distributors could not satisfy any of those promises. The Defendants knew at the time that Sami Distributors made those statements and promises that Sami Distributors could not and would not satisfy any of those promises.

37. In fact, when Triad eventually bid on the CCHHS contract directly in 2011, Triad was adamant that Sami Distributors could not perform any useful function on the radiopharmaceutical contract. Triad sought a waiver of the County's M/WBE requirement in connection with Triad's 2011 bid. To support its request for a waiver, Triad stated:

> The nuclear pharmacy industry is highly regulated by several federal and state agencies that control different aspects of the nuclear pharmacy practice. The regulatory framework of the nuclear pharmacy industry does not allow for any delegation or subcontracting of the activities that Triad undertakes on a daily basis. … As a result, it is difficult for Triad to engage MBE or WBE organizations to perform Triad's activities as subcontracts. All of Triad's activities are performed by employees of Triad.

38. Further, Sami Distributors' August 11, 2008 proposal falsely and fraudulently promised to "observe and comply with all laws, ordinances, regulations and codes of the Federal, State, County and other local government agencies which may in any manner effect the preparation of the Bid Proposal or the performance of the Contract."

39. At the time that Sami Distributors made the statements and promises in the above paragraph, Sami Distributors knew that those statements and promises were false.

40. Further, Sami Distributors' August 11, 2008 proposal falsely and fraudulently promised to not subcontract the CCHHS radiopharmaceutical contract. At the time that Sami Distributors made that statement and promise, it knew that statement and promise was false.

41. Further, Sami Distributors' August 11, 2008 proposal falsely and fraudulently promised to spend approximately $625,000 of the contract funds with M/WBEs MedRx Distributors, Inc. and Beverly A. Simpson, Inc. At the time that Sami Distributors made this promise and statement, Sami Distributors knew that it would not in fact spend any contract with funds with these designated M/WBEs because, instead, nearly 100 percent of the contract was to be passed-through to Covidien.

42. Regarding the ability of any M/WBE to service the CCHHS radiopharmaceutical contract, Triad stated in 2011:

> Due to the high capital investments that are required to handle and process radioactive materials in the United States, the complex, international supply chain for radioactive pharmaceuticals and the lack of domestic locations of the raw materials required to produce medical isotopes, none of Triad's suppliers meet the definition for MBE/WBE in the United States

43. Each of the statements and promises described in paragraphs 35 to 41 were knowingly false at the time they were made and were material to a false and fraudulent claim. Further, these statements, both individually and collectively, fraudulently induced Cook County to enter the contract with Sami Distributors.

44. In addition, any claims for payment made under the contract by Sami Distributors, based on services actually performed by Covidien, were false and fraudulent. For example, Sami Distributors made the following claims for payment:

a. On or about March 25, 2009, Sami Distributors claimed a payment from Cook County for $20,254.55 for radiopharmaceuticals.

b. On or about April 2, 2009, Sami Distributors claimed a payment from Cook County for $21,472.43 for radiopharmaceuticals.

c. On or about May 14, 2009, Sami Distributors claimed a payment from Cook County for $23,220.66 for radiopharmaceuticals.

d. On or about July 9, 2009, Sami Distributors claimed a payment from Cook County for $16,612.85 for radiopharmaceuticals.

e. On or about August 13, 2009, Sami Distributors claimed a payment from Cook County for $6,631.20 for radiopharmaceuticals.

45. The above claims are merely examples of the hundreds of false and fraudulent claims that Sami Distributors submitted pursuant to the 2008 contract.

46. On December 17, 2009, Sami Distributors submitted a bid to retain the CCHHS radiopharmaceuticals contract. This bid contained the same false statements and promises that were contained in the August 11, 2008 bid as described in paragraphs 35 to 40 herein. By the terms of the request for proposal itself, Sami Distributors' December 17, 2009 response became the contract between Sami and CCHHS on February 19, 2010, when CCHHS approved Sami Distributors' December 17, 2009 proposal.

47. With regard to M/WBE utilization, the December 17, 2009 bid differed from the August 11, 2008 bid in that the December 17, 2009 bid claimed that Sami Distributors itself was the qualified M/WBE that would satisfy Cook County's M/WBE requirements. In fact, Sami Distributors was aware at that time it made this promise and statement that it would not perform any commercially useful function in the performance of the contract. Instead, all radiopharmaceuticals would be ordered directly from Covidien and would be delivered directly from Covidien to CCHHS. Sami Distributors' only role would be to pass the invoice to CCHHS for payment and return payment to Covidien, less whatever fee Sami kept for itself in accordance with Sami's arrangement with Covidien.

48. On February 19, 2010, CCHHS awarded the radiopharmaceuticals contract to Sami Distributors.

49. Each of the statements and promises described in paragraphs 46 to 47, and by reference to paragraphs 35 to 40, were knowingly false at the time they were made and were material to a false and fraudulent claim. Further, these statements, both individually and collectively, fraudulently induced Cook County to enter the contract with Sami Distributors.

50. In addition, any claims for payment made under the contract by Sami Distributors, based on services actually performed by Covidien and Triad, were false and fraudulent. For example, Sami Distributors made the following claims for payment:

a. On or about March 3, 2010, Sami Distributors claimed a payment from Cook County for $11,123.41 for radiopharmaceuticals.

b. On or about May 11, 2010, Sami Distributors claimed a payment from Cook County for $21,259.02 for radiopharmaceuticals.

c. On or about June 2, 2010, Sami Distributors claimed a payment from Cook County for $20,819.68 for radiopharmaceuticals.

d. On or about August 3, 2010, Sami Distributors claimed a payment from Cook County for $20,286.05 for radiopharmaceuticals.

e. On or about November 29, 2010, Sami Distributors claimed a payment from Cook County for $20,064.54 for radiopharmaceuticals.

51. When Triad acquired Covidien, it continued the fraud articulated above. Indeed, Triad continued to provide services to CCHHS through Sami Distributors into 2011. In fact, Sami Distributors' one-year contract with CCHHS for the one-year period ending in March 2011 was extended for an additional three months.

B. Use of Bid-Rigging to Secure 2011 Contract

52. In 2010, Relator Blaum joined Hot Shots as the Director of Business Development. In that role, he was responsible for expanding Hot Shots' business by entering into contracts with healthcare providers to fill their radiopharmaceutical needs.

53. In 2011, CCHHS put Pricewaterhouse Coopers LLP in charge of the bidding process for the radiopharmaceutical contract, and an online auction system run by Electronic Auction Services, Inc. was used to identify the low-cost bidder.

54. Shortly before the auction, Blaum received a call from Electronic Auction Services inviting Hot Shots to participate in the bidding process. Because Blaum knew that Triad engaged in fraudulent conduct to obtain the CCHHS contract, Hot Shots had not intended to bid for the CCHHS contract. However, having received the invitation, and based on the changes to the bidding process, Hot Shots decided to submit a bid.

55. In reality, the 2011 bidding process was once again a conspiracy among Dr. Trepashko, Giba, and Triad to defraud the government by rigging the bid and steering the radiopharmaceutical contract to Triad.

56. On April 12, 2011, Triad submitted its bid proposal for the CCHHS radiopharmaceutical contract. That bid proposal eventually became a part of the contract between CCHHS and Triad.

57. In the April 12, 2011 bid proposal, Triad promised that it would "at all times observe and comply with all laws, ordinances, regulations and codes of the Federal, State, County and other local government agencies which may in any manner effect the preparation of the Bid Proposal or the performance of the Contract."

58. Further, Triad's April 12, 2011 bid proposal promised to provide certain radiopharmaceuticals to CCHHS, such as Bexxar, even though Triad knew

at the time that CCHHS never ordered such radiopharmaceuticals and in fact never would.

59. Each of the statements and promises described in paragraphs 57 to 58 were knowingly false at the time they were made and were material to a false and fraudulent claim. Further, these statements, both individually and collectively, fraudulently induced Cook County to enter the contract with Triad.

60. In fact, Giba and Dr. Trepashko altered the quantities requested in the RFP to Triad's benefit. In 2012, when CCHHS was considering putting the radiopharmaceutical contract up for bid again, Dr. Trepashko admitted to Blaum that the quantities in the 2011 RFP came from Giba and Triad. Indeed, the quantities requested in the 2011 RFP for a number of the radiopharmaceuticals were inconsistent with the amounts actually used by CCHHS. In addition, two of Hot Shots' radiopharmacists used to work for Triad while it was providing services to CCHHS under Sami Distributors' contract; they informed Blaum that the expected quantities in the RFP were not consistent with CCHHS's prior usage.

61. One of the drugs included in the RFP was Bexxar, a rarely-used radiopharmaceutical drug that only a limited number of nuclear medicine companies were even licensed to provide. A single dose of the drug costs approximately $35,000.

62. In 2012, Dr. Trepashko confirmed to Blaum that CCHHS has never used Bexxar.

63. The fraudulent use of Bexxar to rig the bid in Triad's favor was consistent with Dr. Trepashko's recommendations to Blaum in 2012 for how Hot Shots could compete for future contracts. At that time, Dr. Trepashko informed Blaum that he could steer the contract to Hot Shots and block Triad from the contract. Dr. Trepashko explained that the way to do this was for Hot Shots to obtain the rights to sell the drug Datscan. Dr. Trepashko said that Triad does not have the right to sell Datscan, so if Hot Shots obtained that right and Dr. Trepashko put Datscan into a future RFP, Hot Shots would win the contract.

64. In 2011, Relator Blaum and Curtis Blaum, Hot Shots' CEO, also began to receive unsolicited communications from Chris Middleton, a radiopharmacist for Triad, informing them that Triad had rigged the bidding process. Among other things, Middleton told the Blaums the following:

a. Dr. Trepashko and Giba worked together to change the expected quantities for various drugs in the RFP to ensure that Triad would have the lowest overall bid in the auction, just as they had done in securing earlier contracts through Sami Distributors.

b. How Triad won the bidding process, including the exact prices Triad had bid for several radiopharmaceutical drugs for which its bid was far below cost, and others for which its bid was extremely high. The ones far below cost were all drugs for which the expected quantities in the RFP seemed unusually high; the ones with extremely high bid prices were all drugs that are used frequently in radiopharmacies.

65. After the bidding process was over and Triad had won the CCHHS contract, Blaum received a copy of the auction results, including the prices bid by each applicant for each drug. The results confirmed Blaum's suspicion of bid-rigging and corroborated the information received from Middleton, including the exact prices Middleton said Triad had bid.

66. The auction results made clear that Triad had won the auction by bidding extremely low on a few products that, because the expected quantity was inflated, generated the appearance of large savings to CCHHS. For example, Triad bid $20 per dose for Tc99 (WBC); Hot Shots and Cardinal Health, the only two legitimate bidders for the contract, bid $1,120 and $1,763.98 per dose, respectively. The quantity requested in the bid was 75 doses, when CCHHS' actual usage in prior years had been around 2-3 doses annually. Similarly, for Sm-153 Quadramet 90 mCi, Triad bid $100 per dose; Hot Shots and Cardinal Health bid $5,250 and $7,301, respectively. Again, the quantity requested in the bid was 35, far more than the normal usage for that drug. The results created the false impression that choosing Triad would generate large savings to CCHHS.

67. The auction results also confirmed that Triad's bids on regularly-used drugs were far higher than its competitors, which meant that based on actual drug usage, CCHHS would end up paying far more to Triad under the contract than it would have paid to Hot Shots or Cardinal. For example, for Tc99m Sestamibi, Triad bid $68, while Hot Shots bid $40, a price in line with the amount Hot Shots, Triad, and other radiopharmacies charged to other hospitals. Because the actual

usage of this drug is more than 2,000 doses annually, CCHHS ultimately paid Triad far more than it would have paid Hot Shots. Similarly, for TL-201 4 mCi, Triad bid $20 per millicurie, while Hot Shots bid $15. Because the bid estimates that each dose will require an average of four millicurie, the dose prices bid by Triad and Hot Shots were $80 and $60, respectively. The expected quantity of this drug used annually is also over 2,000 doses.

68. Through the foregoing, Triad won the auction with the lowest overall pricing. On May 26, 2011, CCHHS approved the Triad contract for one year, from July 1, 2011 to June 30, 2012, at an anticipated cost of $1.6 million.

69. If the drug usage amounts in the RFP reflected actual usage instead of the deliberately skewed usage, Hot Shots' bid would have been approximately $300,000 less than Triad's bid.

70. In addition, through the foregoing, Defendants Triad, Giba, and Trepashko conspired to prevent Hot Shots, which had the lowest overall bid among the legitimate bidders, from winning the CCHHS contract.

## Count I

### Federal False Claims Act Regarding 2008 and 2009 Contracts By Relator Blaum Against All Defendants

71. Relator incorporates each of the paragraphs of this complaint as if fully set forth herein.

72. Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or

approval concerning the 2008 and 2009 CCHHS contracts awarded to Sami Distributors, in violation of 31 U.S.C. § 3729(a)(1)(A).

73. Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim concerning the 2008 and 2009 CCHHS contracts awarded to Sami Distributors, in violation of 31 U.S.C. § 3729(a)(1)(B).

74. Through the above-described conduct, Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) or (B) concerning the 2008 and 2009 CCHHS contracts awarded to Sami Distributors, in violation of 31 U.S.C. § 3729(a)(1)(C).

75. Defendants, and each of them, acted with knowledge of the falsity as that term is defined in the federal False Claims Act.

WHEREFORE, Relator Blaum respectfully demands:

A. Judgment in favor of himself and the United States of America and against Defendants, jointly and severally, in the amount of $11,000 for each false claim and false statement that Defendants submitted, together with treble the amount of payment received and/or costs avoided;

B. Judgment awarding Relator 30% of any recovery;

C. Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D. Any other relief to which Relator may appear entitled.

## Count II

## State False Claims Act Regarding 2008 and 2009 Contracts By Relator Blaum Against All Defendants

76. Relator incorporates each of the paragraphs of this complaint as if fully set forth herein.

77. Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval concerning the 2008 and 2009 CCHHS contracts awarded to Sami Distributors, in violation of 740 ILCS 175/3(a)(1)(A).

78. Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim concerning the 2008 and 2009 CCHHS contracts awarded to Sami Distributors, in violation of 740 ILCS 175/3(a)(1)(B).

79. Through the above-described conduct, Defendants conspired to commit a violation of 740 ILCS 175/3(a)(1)(A) or (B) concerning the 2008 and 2009 CCHHS contracts awarded to Sami Distributors, in violation of 740 ILCS 175/3(a)(1)(C).

80. Defendants, and each of them, acted with knowledge of the falsity as that term is defined in the Illinois False Claims Act.

WHEREFORE, Relator Blaum respectfully demands:

A. Judgment in favor of himself and the State of Illinois and the County of Cook, and against Defendants, jointly and severally, in the amount of $11,000 for each false claim and false statement that Defendants submitted, together with treble the amount of payment received and/or costs avoided;

B. Judgment awarding Relator 30% of any recovery;

C. Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D. Any other relief to which Relator may appear entitled.

## Count III

### Federal False Claims Act Regarding 2011 Contract By Relator Blaum Against Triad, Giba, and Trepashko

81. Relator incorporates each of the paragraphs of this complaint as if fully set forth herein.

82. Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval concerning the 2011 CCHHS contract awarded to Triad, in violation of 31 U.S.C. § 3729(a)(1)(A).

83. Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim concerning the 2011 CCHHS contract awarded to Triad, in violation of 31 U.S.C. § 3729(a)(1)(B).

84. Through the above-described conduct, Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) or (B) concerning the 2011 CCHHS contract awarded to Triad, in violation of 31 U.S.C. § 3729(a)(1)(C).

85. Defendants, and each of them, acted with knowledge of the falsity as that term is defined in the federal False Claims Act.

WHEREFORE, Relator Blaum respectfully demands:

A. Judgment in favor of himself and the United States of America and against Defendants, jointly and severally, in the amount of $11,000 for each false claim and false statement that Defendants submitted, together with treble the amount of payment received and/or costs avoided;

B. Judgment awarding Relator 30% of any recovery;

C. Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D. Any other relief to which Relator may appear entitled.

Count IV

State False Claims Act Regarding 2011 Contract
By Relator Blaum Against All Triad, Giba, and Trepashko

86. Relator incorporates each of the paragraphs of this complaint as if fully set forth herein.

87. Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval concerning the 2011 CCHHS contract awarded to Triad, in violation of 740 ILCS 175/3(a)(1)(A).

88. Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim concerning the 2011 CCHHS contract awarded to Triad, in violation of 740 ILCS 175/3(a)(1)(B).

89. Through the above-described conduct, Defendants conspired to commit a violation of 740 ILCS 175/3(a)(1)(A) or (B) concerning the 2011 CCHHS contract awarded to Triad, in violation of 740 ILCS 175/3(a)(1)(C).

90. Defendants, and each of them, acted with knowledge of the falsity as that term is defined in the Illinois False Claims Act.

WHEREFORE, Relator Blaum respectfully demands:

A. Judgment in favor of himself and the State of Illinois and the County of Cook, and against Defendants, jointly and severally, in the amount of $11,000 for each false claim and false statement that Defendants submitted, together with treble the amount of payment received and/or costs avoided;

B. Judgment awarding Relator 30% of any recovery;

C. Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D. Any other relief to which Relator may appear entitled.

Count V

Sherman Antitrust Act Regarding 2011 Contract
By Plaintiff Hot Shots Against Triad, Giba, and Trepashko

91. Plaintiff incorporates each of the paragraphs of this Complaint as if fully set forth herein.

92. Through the above-described conduct, Defendants entered into a conspiracy resulting in an unreasonable restraint of trade or commerce, in violation of 15 U.S.C. § 1.

93. Defendants conspired to restrain trade by suppressing competition and depriving Plaintiff Hot Shots and other legitimate radiopharmaceutical service providers in the Chicago-area market a fair and competitive bid process, and thereby generating inflated profits for Defendants at greater expense to CCHHS.

94. Defendants further conspired to restrain trade by exchanging and sharing non-public information about the RFP, including deliberate manipulations made to the RFP for the benefit of Defendants, and about the pricing in Defendants' bid submissions for the CCHHS contract.

95. Pursuant to their unlawful conspiracy, Defendants have reduced competition among providers of radiopharmaceutical services in the Chicago-area market by preventing legitimate low-cost bidders such as Plaintiff from competing equally for the CCHHS radiopharmaceutical contract and thereby depriving them of the opportunity to win the contract.

96. Plaintiff Hot Shots suffered substantial economic harm to its business or property as a result of Defendants' unlawful conduct, including the denial of a lucrative contract with CCHHS and lost profits therefrom. Such injury is of the type the antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

97. The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce. Among other things, Plaintiff Hot Shots and Defendants Triad and Covidien provide radiopharmaceutical services in various states; many of the radiopharmaceutical drugs at issue in the RFPs are

manufactured in various states and/or transported across state lines; and the funds used to pay Defendants for radiopharmaceutical drugs include Medicare/Medicaid and Disproportionate Share Hospital funds obtained from the United States and mailed and/or transferred across state lines.

98. The unlawful conduct alleged herein directly harmed the ultimate customers of radiopharmaceutical contracts. Indeed, the unlawful conduct resulted in CCHHS entering into an inflated contract to pay $300,000 more for the exact same products it could have obtained from Hot Shots.

WHEREFORE, Plaintiff Hot Shots respectfully demands:

A. Judgment in favor of itself against Defendants (except Covidien), jointly and severally, together with treble the amount of damages sustained;

B. Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action;

C. Judgment awarding prejudgment interest; and

D. Any other relief to which Plaintiff may appear entitled.

## Count VI

## Illinois Antitrust Act Regarding 2011 Contract By Plaintiff Hot Shots Against Triad, Giba, and Trepashko

99. Plaintiff incorporates each of the paragraphs of this Complaint as if fully set forth herein.

100. Through the above-described conduct, Defendants entered into a conspiracy with a competitor, in violation of 740 ILCS 10/3.

101. Through the above-described conduct, Defendants entered into a conspiracy with one or more other persons resulting in an unreasonable restraint of trade or commerce, in violation of 740 ILCS 10/3.

102. Plaintiff Hot Shots suffered substantial economic harm to its business or property as a result of Defendants' unlawful conduct, including the denial of a lucrative contract with CCHHS and lost profits therefrom. Such injury is of the type the antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

103. Defendants' violations were willful.

104. The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce, and has an impact in Illinois and affects the State, its political subdivisions, businesses and consumers.

105. The unlawful conduct alleged herein directly harmed the ultimate customers of radiopharmaceutical contracts. Indeed, the unlawful conduct resulted in CCHHS entering into an inflated contract to pay $300,000 more for the exact same products it could have obtained from Hot Shots.

WHEREFORE, Plaintiff Hot Shots respectfully demands:

A. Judgment in favor of itself against Defendants (except Covidien), jointly and severally, together with treble the amount of damages sustained;

B. Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action;

C. Judgment awarding prejudgment interest; and

D. Any other relief to which Plaintiff may appear entitled.

## Count VII

### Tortious Interference With Prospective Business Opportunity By Plaintiff Hot Shots Against Triad, Giba, and Trepashko

106. Plaintiff incorporates each of the paragraphs of this Complaint as if fully set forth herein.

107. As set forth above, Plaintiff Hot Shots had a reasonable expectation of entering into a valid business relationship with CCHHS. Hot Shots was a highly qualified bidder for the 2011 radiopharmaceutical contracts. Hot Shots submitted a qualified bid that was lower than any other legitimate bid. The only reason that Hot Shots did not receive the 2011 CCHHS contract is that Defendants engaged in the wrongful and illegal conduct alleged herein.

108. Defendants had knowledge of Hot Shots' expectation of entering into a valid business relationship with CCHHS.

109. Through the above-described conduct, Defendants purposefully interfered to prevent Plaintiff Hot Shots' legitimate expectancy from ripening into a valid business relationship.

110. Plaintiff Hot Shots suffered damages as a result of Defendants' purposeful interference.

111. Defendants' actions were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights.

WHEREFORE, Plaintiff Hot Shots respectfully demands:

A. Judgment in favor of itself against Defendants (except Covidien), jointly and severally, awarding compensatory damages, along with punitive damages.

B. Any other relief to which Plaintiff may appear entitled.

## JURY DEMAND

The United States of America, the State of Illinois and the County of Cook, on relation of Matthew Blaum, and Plaintiff Hot Shots, hereby demand trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ Daniel M. Twetten
One of Counsel for Plaintiff and Relator

Arthur Loevy
Jon Loevy
Daniel Twetten
Anand Swaminathan
312 N. May Street, Suite 100
Chicago, Illinois 60607
(312) 243-5900

Barker Law Offices
203 N. La Salle Street, Suite 2100
Chicago, IL 60601

Certificate of Service

I, Daniel Twetten, certify that the foregoing Amended Compliant was served on all counsel of record through the Court's ECF/CM System on July 14, 2014.

/s/ Daniel M. Twetten