**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| STATE OF ILLINOIS, and COOK COUNTY | ) | |
| *ex rel.* MATTHEW BLAUM, | ) | |
| | ) | Case No.: 11-cv-8098 |
| Relator, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| and HOT SHOTS NM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| TRIAD ISOTOPES, INC.; COVIDIEN, INC.; | ) | |
| TODD GIBA; DONALD TREPASHKO, M.D.; | ) | |
| and SAMI DISTRIBUTORS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' motions to dismiss [94, 96, 99, 102, 103] Relator's and Plaintiff's amended complaint [88]. Defendants' motions are denied as to Counts I–IV and granted as to Counts V–VII. Counts V–VII of the amended complaint are dismissed without prejudice. Relator and Plaintiff should inform the court within 14 days as to whether they intend to file a second amended complaint repleading Counts V–VII, at which time the Court will set a status hearing to discuss scheduling moving forward.

## I.     Background[1]

On November 11, 2011, Relator Matthew Blaum brought this *qui tam* action on behalf of the United States and the State of Illinois, alleging violations of the False Claims Act, 31 U.S.C.

---

[1]  The Court accepts as true the facts alleged in Relator's and Plaintiff's amended complaint and makes all reasonable inferences in their favor. See *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012).

§ 3729 *et seq.* ("FCA"),[2] and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1 *et seq.* ("IWRPA"). In addition, Plaintiff Hot Shots NM, LLC alleged that Defendants violated state and federal antitrust laws, and tortiously interfered with its prospective business opportunities. The federal government declined to intervene [15] on October 28, 2013, prompting the court to unseal the complaint [16]. In April 2014, Defendants filed individual motions to dismiss the complaint, which were mooted three months later when Relator Blaum and Plaintiff Hot Shots filed an amended complaint [88]. Now before the Court are Defendants' motions to dismiss the amended complaint.

Originally there were seven named Defendants in this case. On January 12, 2015, Relator and Plaintiff filed a Rule 41 stipulation of voluntary dismissal with prejudice of individual Defendants Faisal Sami and Sarah Faisal (keeping as a Defendant Sami Distributors, Inc.), and the Court subsequently entered an order dismissing only those two defendants [126].[3] Each of remaining five Defendants filed an individual motion to dismiss the amended complaint: Dr. Trepashko [95], Covidien [97], Triad Isotopes [100], Mr. Giba (adopting Covidien and Triad Isotopes' arguments) [102], and Sami Distributors [104]. Relator and Plaintiff filed a single response brief [110], and each Defendant filed an independent reply [115, 117, 119, 120, 121].

---

[2] The FCA was amended in 2009, and various sections of the FCA became effective at different times. See, *e.g.*, *United States ex rel. Frawley v. McMahon*, 2015 WL 115763, at *8 (N.D. Ill. Jan. 5, 2015). Here, the allegedly fraudulent conduct relating to the 2008 and 2010 CCHHS contracts took place both before and after the FCA amendments went into effect, meaning that most likely both the pre- and post-amendment statutes are relevant here.

[3] Sami Distributors argues in its reply brief that Relator's claims against it are barred by *res judicata* based on Relator's voluntary dismissal of individual Defendants Faisal Sami and Sarah Faisal. [See 121, at 1–4.] But *res judicata* has no application here. The preclusive effect of the voluntary dismissal with prejudice means that Relator is barred from raising similar claims against Faisal Sami and Sarah Faisal in a separate lawsuit; it does not release Sami Distributors from the claims currently pending against it.

**A.      Cook County Health and Hospital System and Radiopharmaceuticals**

Relator alleges that from at least 2008 through 2011, Defendants defrauded Cook County, Illinois and the Cook County Health and Hospitals System ("CCHHS") by making false statements and false claims regarding the sale of radiopharmaceutical drugs. CCHHS, formerly known as the Cook County Bureau of Health Services, oversees a comprehensive and integrated healthcare system covering Chicago and suburban Cook County, composed of hospitals, ambulatory and community health network clinics, a public health department, a correctional healthcare facility, and an outpatient infectious disease center. Specific facilities within the healthcare conglomerate include John H. Stroger Jr. Hospital, Provident Hospital, Oak Forest Hospital, Cook County Department of Public Health, Cermak Health Services, the Ruth Rothstein CORE Center, and 16 ambulatory and Community Health Network clinics.

CCHHS's annual revenues exceed $900 million. The majority of that revenue comes from patient services, and approximately 39 percent of CCHHS's patient revenue comes from the federal Medicare and Medicaid programs. Because CCHHS serves all patients, it has a substantial shortfall each year between its expenses and the revenue generated by patient care, and that shortfall is made up with funding from Cook County. In 2011, for example, Cook County provided CCHHS with approximately $368 million in funding. CCHHS spends approximately $2 million per year on radiopharmaceutical drugs.

Radiopharmaceutical drugs, which fall within the nuclear pharmacy industry, are used to treat certain medical conditions (such as cancer) and to perform radiological testing (such as CT scans and MRIs). The purchase, storage, and sale of these drugs are highly regulated by several federal and state industries, and distributors must hold a license to provide radiopharmaceuticals.

### B. 2008 and 2010 Contracts

Defendant Dr. Trepashko is a nuclear radiologist for CCHHS. As head of the Nuclear Medicine department at CCHHS, he has substantial control over the awarding of CCHHS's annual contract for nuclear medicine. Dr. Trepashko had a close relationship with Defendant Mr. Giba, a sales representative for global healthcare-products provider Covidien, Inc. (which also is a Defendant here). Relator alleges that in 2008—when Relator himself was a Sales Specialist at Covidien—Dr. Trepashko provided Mr. Giba with insider information about how to ensure that Covidien obtained CCHHS's 2008 radiopharmaceutical contract. Specifically, Dr. Trepashko formulated a plan that would have Sami Distributors—a Minority- or Woman-Owned Business Entity ("M/WBE") with no experience or qualifications in providing radiopharmaceutical drugs—submit a bid on its own behalf, when in fact the plan was to have Covidien fulfill the terms of the contract. In that scenario, Sami was slated to be a "pass-through" entity that would handle some paperwork (*e.g.*, billing CCHHS), but would provide no commercially useful functions regarding the purchase, storage, or sale of radiopharmaceuticals. All parties benefitted from this arrangement: Sami won (on paper) the contract, earning it a cut of the proceeds; Covidien won (in reality) the contract, earning it the bulk of the proceeds; CCHHS was a step closer to complying with Cook County's aspirational goal that 35 percent of all contracts for professional and consulting services be with M/WBEs; and Dr. Trepashko was in the good graces of Covidien and Sami, who rewarded him with expensive dinners and lucrative speaking engagements.

According to the amended complaint, Dr. Trepashko passed the torch to Mr. Giba to carry out the scheme. Just prior to the 2008 bid submissions, Mr. Giba met with Faisel Sami of Sami Distributors at Mr. Sami's home to secure his participation in the plan. After reaching an

agreement, Mr. Giba went to a nearby restaurant, where—utilizing insider information provided to him by Dr. Trepashko—he prepared the bid form that Sami would ultimately submit to CCHHS. The bid form itself listed a number of radiopharmaceutical drugs and the quantities of those drugs that CCHHS anticipated using in the upcoming year. Bidders were required to provide a per-dose price for each drug and, if awarded the contract, a bidder would be required to honor its contract price regardless of the quantities actually ordered by CCHHS during the contract term. Mr. Giba's tactic, informed by Dr. Trepashko, was to lower Sami's bid price for one specific drug, which had the effect of making Sami the overall lowest bidder in the lot. Sami approved and submitted this bid on August 11, 2008, and CCHHS awarded Sami the 2008 radiopharmaceutical contract on December 5, 2008.

In addition to this price-fixing scheme, Sami made a number of misrepresentations calculated to ensure that it would win the contract, including (1) that it would maintain an inventory allowing same-day delivery (or one-hour delivery in emergency situations), (2) that it would meet certain transportation and delivery requirements relating to radiopharmaceuticals as dictated by Illinois law, (3) that it would pick-up expended radioactive syringes, (4) that it would maintain a current license from the State of Illinois, Department of Nuclear Safety, Radioactive Material License pursuant to the Illinois Radiation Protection Act and Regulations for Radiation Protection, allowing it to receive, acquire, own, possess, and transfer radioactive materials, (5) that it would not subcontract the CCHHS radiopharmaceutical contract, and (6) that it would spend $625,000.00 of the contract funds with other M/WBE contractors (specifically, MedRx Distributors, Inc. and Beverly A. Simpson, Inc.). Relator alleges that Sami never intended to perform any of these functions; instead, it was the conspirators' plan all along to have Covidien execute all radiopharmaceutical services directly with CCHHS, with Sami acting only as a pass-

through entity. Nonetheless, after obtaining the contract, Sami proceeded to submit hundreds of invoices to CCHHS for the sale of radiopharmaceuticals as if it were performing under the contract, even though the bulk of those proceeds were funneled to Covidien.

On December 17, 2009, Sami submitted a bid to retain the CCHHS radiopharmaceutical contract. The bidding process did not change, and the conspirators put forth a nearly identical bid. Two months later, CCHHS again awarded Sami the radiopharmaceutical contract. One key difference is that in the 2010 bid, Sami represented that its earnings under the contract would satisfy the county's M/WBE ordinance (which requires the entity to perform a "commercially useful function"). Because Sami maintained its passive role as a pass-through entity, it didn't perform any commercially useful functions, and thus knowingly misrepresented itself in order to induce CCHHS into awarded it the contract.

### C.     2011 Contract

Several changes occurred between the bidding periods for CCHHS's 2010 and 2011 radiopharmaceutical contracts. First, Triad Isotopes—a nationwide radiopharmaceutical company based in Orlando, Florida—acquired Covidien's radiopharmaceutical business (in a deal that they announced in December 2009 and finalized in June 2010), prompting Mr. Giba to transition over as a Triad Isotopes employee. Second, in 2010, Relator left Covidien and joined a competing radiopharmaceutical provider called Hot Shots as their Director of Business Development. Third, CCHHS enlisted Pricewaterhouse Coopers to revamp the bidding process for their radiopharmaceutical process. Specifically, while CCHHS still used a similar RFP that listed certain radiopharmaceutical drugs and expected usage quantities, the bidding itself would be accomplished through an online auction system run by Electronic Auction Services, Inc.,

meant to ensure same-time, blind bidding wherein the lowest bidder would be awarded the contract.

Because of the change in the bidding process for the CCHHS radiopharmaceutical contract, Defendants were forced to rejigger their scheme to ensure that Dr. Trepashko's chosen provider, Mr. Giba (now with Triad Isotopes) would win the contract. Due to the added scrutiny over the bidding process (and at Triad Istopes' insistence), Sami was dropped as the middle-man in the scheme. Instead, Triad Isotopes submitted a bid on its own. But because the new bidding process meant that Triad Isotopes would be bidding without any insider knowledge as to where its competitors' bids would be, the conspirators had to devise a new way of ensuring victory. Their solution was to alter the bid form itself by raising the expected usage quantities of infrequently used (but expensive) drugs. For example, Triad Isotopes bid $20 per dose for the drug Tc99 (WBC), and Hot Shots and Cardinal Health bid $1,120.00 and $1,763.98 per dose, respectively. The quantity listed in the bid was 75 doses, when CCHHS's actual usage in prior years had been approximately 2–3 doses annually. Similarly, Triad Isotopes bid $100 per dose for the drug Sm-153 Quadramet 90 mCi, and Hot Shots and Cardinal Health bid $5,250 and $7,301 per dose for that same drug. And again, the quantity requested, 35, far exceeded CCHHS's historical usage.

This bidding tactic dramatically lowered Triad Isotopes bottom line pricing, which allowed it to raise its prices on commonly-used drugs. For example, for Tc99m Sestamibi, of which CCHHS purchases approximately 2000 doses per year, Triad Isotopes bid $68/dose while Hot Shots bid $40/dose. Similarly, CCHHS purchases approximately 2000 doses of TL-201 4 mCi annually, and Triad Isotopes' and Hot Shots' respective bid prices were $80/dose and $60/dose.

Triad Isotopes had the overall lowest bid (and thus won the contract), and Hot Shots had the second lowest bid. Relator alleges that absent Defendants' fraudulent alteration of the bid form, Hot Shots would have won the contract, and would have saved CCHHS over $300,000. Reflecting on his role in the multi-year conspiracy, Dr. Trepashko said to Relator that he didn't care what happened to the money or how much the drugs cost; it was CCHHS's money, not his.

## II.    Legal Standard

In reviewing the sufficiency of a complaint, a district court must accept all well-plead facts as true and draw all permissible inferences in favor of the plaintiff. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012). The Federal Rules of Civil Procedure require only that a complaint provide the defendant with "fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Supreme Court has described this notice-pleading standard as requiring a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). While factual allegations must be accepted as true, legal conclusions may not be considered. *Id.*

The pleading standard under Federal Rule of Civil Procedure 8(a), as applied in the antitrust context, "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff must plead facts that "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556 ("And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" (citation omitted)); *In re Text Messaging Antitrust*

*Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("The fact that the allegations undergirding a claim could be true is no longer enough to save a complaint from being dismissed; the complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' connote.").

In addition to meeting the Rule 8(a) requirements, fraud-based claims brought under the False Claims Act—an anti-fraud statute—are subject to the heightened pleading standard of Rule 9(b). *United States ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) says that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading 'ordinarily requires describing the who, what, when, where, and how of the fraud.'" *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011)).

## III.  Analysis

### A.  False Claims Act Claims

Relator alleges that Defendants' conduct surrounding (a) the 2008 and 2010 CCHHS radiopharmaceutical contracts and (b) the 2011 CCHHS radiopharmaceutical contract violated both the federal False Claims Act ("FCA") and the Illinois Whistleblower Reward and Protection Act ("IWRPA"), which is identical to the federal false-claims statute except with respect to which governmental entity served as the target for the fraud (*i.e.*, federal or state). Because courts generally apply the same pleading standard for both federal and state FCA claims, see, *e.g.*, *United States ex rel. Upton v. Family Health Network, Inc.*, 900 F. Supp. 2d 821, 828 (N.D.

Ill. 2012); *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 816

(N.D. Ill. 2013), the Court will assess Relator's federal and state claims simultaneously.

The False Claims Act and IWRPA impose liability on any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A) [or] (B) * * *.

31 U.S.C. § 3729(a)(1)(A)–(C); 740 Ill. Comp. Stat. 175/3(a)(1)(A)–(C); see also *United States*

*ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011); *United States ex rel.*

*Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006).

Relator's theory for liability under the FCA and IWRPA is that Defendants' fraudulently

induced CCHHS to enter into the 2008, 2010, and 2011 radiopharmaceutical contracts by

making contractual promises without intending to perform them, and thus, while the individual

claims for payment on those contracts were not themselves false, they were predicated on the

fraudulently-induced underlying contracts, thus bringing them within the sphere of prohibited

claims under the FCA statutes (*i.e.*, a fraudulent-inducement theory of liability). Each of the five

Defendants seeks dismissal of these claims on multiple grounds, many of which overlap. For

simplicity, the Court will address Defendants' arguments relating to the 2008 and 2010 contracts

first, followed by Defendants' arguments related to the 2011 contract.

1. **The 2008 and 2010 Contracts**

a. **False Statement**

The most prevalent objection to Relator's FCA claims regarding the 2008 and 2010

CCHHS contracts is that Relator failed to identify any claim for payment that was actually *false*.

In other words, Defendants focus on the actual invoices that Sami sent to CCHHS seeking payment for the radiopharmaceuticals that were provided (by Covidien, as it turned out) under the 2008 and 2010 contracts, and argue that Relator did not (and cannot) allege that any of those individual invoices was false. Relator counters by arguing that this approach is too myopic and ignores the fact that Sami bid on these contracts to provide radiopharmaceuticals knowing that it was in no way fit to do so; instead, Sami served as a paradigmatic middle-man. Although Covidien supplied the radiopharmaceuticals directly to CCHHS, Covidien and CCHHS (with help from Defendants Giba and Trepashko) filtered the paperwork through Sami so that CCHHS could reap the benefits of contracting with a minority-owned business. The question, then, is whether Sami's misrepresentations in obtaining the 2008 and 2010 contracts pollute its subsequent invoices so as to transform those invoices into false claims under the FCA. See, *e.g.*, *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543–44 (1943) ("This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen [invoice] which was the basic cause for payment of every dollar paid by the [government] * * *. The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded."); S. Rep. No. 99-345, at 9 (1986), reprinted in 1986 U.S.C.C.A.N. at 5226, 5274 ("[E]ach and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct * * * constitutes a false claim.").

Where a relator argues that a defendant's false claims were predicated on a fraudulently induced contract, in order to survive a motion to dismiss, the relator need only "provide[] a plausible basis for believing that the defendant entered into a government contract with the intent not to perform or with the knowledge that it could not preform as promised." *United States ex*

*rel. Wildhirt v. AARS Forever, Inc.*, 2011 WL 5373985, at *1 (N.D. Ill. Nov. 4, 2011) (citing *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 853–54 (7th Cir. 2009) ("Simple breach of contract is not fraud, but making a promise while planning not to keep it *is* fraud.")); *see also United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."); *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) (suggesting that an FCA claim based on misrepresentations regarding the defendant's ability to perform the terms of the contract would be actionable). This approach comports with the Supreme Court's instruction that the False Claims Act be construed broadly so as "to reach all types of fraud, without qualification, that might result in financial loss to the Government[;][4] * * * the Court has consistently refused to accept a rigid, restrictive reading" of the act. *United States v. Neifert–White Co.*, 390 U.S. 228, 232 (1968); *Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (discussing the legislative history of the FCA and its focus on protecting the federal fisc).

Here, Relator alleges that Sami falsely represented to CCHHS that it would store and provide radiopharmaceuticals in accordance with the terms of the contract—knowing that Covidien would actually be the one performing Sami's contractual obligations—thereby fraudulently inducing CCHHS into contracting with Sami. Relator claims that Sami was simply a "pass-through" entity that did not perform any "commercially useful functions" but nonetheless received a cut of the contract funds for its middle-man function. Relator does not allege that any

---

[4] Exactly how, or if, Defendants' fraudulent inducement resulted in a financial loss to the government is unclear from Relator's complaint. But "whether harm to the public fisc is an essential element of a *qui tam* action" is unclear, as the Supreme Court failed to address that issue after granting certiorari on that very question. See *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 945 (1997). Regardless, Defendants did not raise this issue, and so the Court need not resolve it here.

of Sami's actual invoices to CCHHS were fraudulent, but that those invoices were tainted by the underlying fraudulent inducement. This is sufficient to state an FCA claim under a fraudulent-inducement theory.[5] See, *e.g.*, *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 468 (5th Cir. 2009) ("Under a fraudulent inducement theory, although the Defendants' subsequent claims for payment made under the contract were not literally false, [because] they derived from the original fraudulent misrepresentation [in the grant proposals], they, too, became actionable false claims." (alterations in original)).

Expanding on his fraudulent-inducement theory of liability, Relator describes several additional misrepresentations that Sami (with the help of Defendants) made to the government knowing at the time that their statements were false: (1) that Sami promised in the 2008 contract to spend $625,000.00 of the contract with M/WBEs despite having no intention to do so, (2) that Sami promised in the 2010 contract that its earnings under the contract would satisfy the county's M/WBE ordinance (which requires the entity to perform a "commercially useful function"),[6] and (3) that Sami obtained both the 2008 and 2010 the contracts through bid-rigging,

---

[5] Defendants pose somewhat of a straw man argument when they argue in response that "a mere breach of contract does not give rise to liability under the False Claims Act." *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 824 (7th Cir. 2011) ("If the breaching party falsely claims to be in compliance with the contract to obtain payment, however, there may be an actionable false claim."). This principle exists outside of the fraud-in-the-inducement cases, and instead applies where a party misrepresents to the government that it is in compliance with a statute, regulation, or contract in order to induce a government benefit. These so-called "false certification" cases turn on the extent of the breach and whether the certification of compliance was a prerequisite to government payment, such that "minor technical regulatory violations do not make a claim 'false' for purposes of the FCA." *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). But a mere breach of contract (or noncompliance with a regulation or statute) is different in kind from a fraudulently induced contract, where at the outset a contracting party has no intention of complying with its contractual obligations. Additionally, Relator confirmed that he "is not pursuing a theory [of liability] based on false certifications, whether such certifications are express or implied." [110, at 10 n.5.]

[6] Cook County's M/WBE ordinance allows an M/WBE to function as a broker, which is essentially the role that Relator claims Sami filled. But using an M/WBE as a broker only entitles the user to a credit equal to 10 percent of the value of the goods that the M/WBE brokers, not the 100 percent that Sami allegedly represented. See Cook County Code § 34-281.

which is a form of fraudulent inducement.[7] These allegations also serve as potential grounds for FCA liability under Relator's fraudulent-inducement theory. See, *e.g.*, *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, (7th Cir. 2014) (noting that "[m]aking a false promise in order to obtains something of value is fraud, and can be the basis of a claim under the False Claims Act," and emphasizing the need for a relator to show that the defendant knew that the promise was false when making it (internal citation omitted)).

### b.     Materiality, Reliance, Causation, and Inducement

Defendants volley a number of additional attacks on Relator's false-claims allegations, intertwining arguments that invoke the somewhat-related issues of materiality, reliance, causation, and inducement. Starting with materiality, a material statement (in the context of an FCA claim) is one that has the potential to influence the government's decision to pay or approve a false claim. See *Yannacopoulos*, 652 F.3d at 828. But under a fraudulent-inducement theory, Relator must show not only that Defendants' misrepresentations had *the potential* to induce government action, but actually *did* induce (or cause) the government to act, thus invoking the legal principles of causation, reliance, and inducement.[8] See, *e.g.*, *Marcus*, 317 U.S. at 543–44; *United States ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569–71 (E.D. Pa. 2014) ("In essence, the essential element of inducement or reliance is one of causation."). At the pleading

---

[7] See *Harrison*, 176 F.3d at 787–88 (noting that, based on the language in the Supreme Court case of *Marcus v. Hess*, "courts have found False Claims Act violations in [various] bid-rigging situations"); *United States v. CFW Const. Co., Inc.*, 649 F. Supp. 616, 618 (D.S.C. 1986) ("The conspiracy to rig bids on two federal funded * * * treatment projects falls within the proscription of [31 U.S.C. § 3729(b)(1)(C)]. In addition, the claims for payment submitted to the United States under the rigged contract that resulted from the conspiracy are false claims subjecting them to liability under [31 U.S.C. § 3729(b)(1)(A)]." (internal citations omitted)).

[8] Even though materiality and reliance/inducement are separate inquiries, because the latter is essentially a more demanding version of the former, and because Defendants' arguments related to both issues are based on the same set of facts, the Court will address these arguments simultaneously. See, *e.g.*, *United States ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569–71 (E.D. Pa. 2014) (discussing the difference between the materiality and reliance/inducement standards).

stage, Relator's allegations of materiality and inducement need only be plausible. *Lusby*, 570 F.3d at 854.

Defendants argue that dismissal of Relator's FCA claims is appropriate because Relator failed to plead that CCHHS actually relied on any false statement in awarding the 2008 and 2010 contracts to Sami (or, put another way, that Defendants' statements did not induce—or cause—CCHHS to contract with Sami). Essentially Defendants' argument is that Dr. Trepashko knew about Sami's pass-through role and the other alleged misrepresentations and, acting on behalf of CCHHS, he contracted with Sami anyway. But Defendants fail to appreciate a major factual component of Relator's complaint: that CCHHS's decisionmaker (Dr. Trepashko) was part of the vertical bid-rigging conspiracy. Accordingly, it is no surprise that Dr. Trepashko approved of the middle-man set-up despite "kn[owing] full well how the arrangement would work in practice" because, according to Relator, he orchestrated it. [See 120, at 9.]

Regardless, the Court's focus at this stage is on Relator's allegations, and Relator clearly alleges that Defendants' false statements were material, were intended to induce CCHHS into contracting with Sami, and actually induced CCHHS into contracting with Sami. [Am. Compl., 88, ¶¶ 43, 49.] In addition to these high-level allegations, Relator sets forth in detail each material misrepresentation, and explains how each misrepresentation was a calculated effort on the part of the conspiracy to ensure that CCHHS would select Sami as the recipient of the radiopharmaceutical contracts. Relator's allegations are plausible because if these misrepresentations were not necessary to induce CCHHS into selecting Sami, why would Dr. Trepashko, the purported decisionmaker, have pushed for their inclusion?

In a related argument, Defendant Covidien claims that Relator failed to plead "that any statement or claim by Covidien *caused* CCHHS to make a payment it would not have otherwise

made," arguing that this precludes Relator from meeting its burden to show that "if [Defendants'] statement or claim had not been 'false,' the government would not have issued payment." [97, at 18.] Relator did not respond directly to this argument, nor did Covidien re-raise it in their reply brief. This argument was likely mooted by Relator's focus on his fraudulent-inducement theory of liability, wherein Relator alleges that CCHHS wouldn't have made *any* payments to Defendants had it not been fraudulently induced into entering the Sami contracts in the first place, meaning that Defendants' statements made to induce the contracts did in fact cause CCHHS to make payments it would not have otherwise made. Whether Covidien abandoned this argument or not, it is not an appropriate ground for dismissal.

### c. Governmental Funding

To plead FCA and IWRPA claims, Relator must show that Defendants presented fraudulent claims *to the government* in order to obtain governmental funding; here, both federal and state. Relator alleged the following:

> CCHHS['s] annual revenues exceed $900 million. The majority of that revenue comes from payments for services, including payments from the [federal] Medicare and Medicaid programs. Approximately 39 percent of CCHHS's patient revenue comes from Medicare and Medicaid. Because CCHHS serves all patients, it has a substantial shortfall each year between its expenses and the revenue generated by patient care. This shortfall is made up by the County directly. In 2011, for example, the County provided CCHHS approximately $368 million to make up for its shortfall.

[Am. Compl., 88, ¶ 22.] Relator also cites to specific invoices, including dates and amounts, that Sami submitted to the government for payment based on services rendered under the fraudulently-induced contracts. [*Id.*, ¶¶ 44, 50.]

To be clear, Relator does not allege that Sami submitted claims directly to the federal government.[9] Instead, Relator argues that Sami presented its fraudulent claims to an officer or

---

[9] Defendants do not object to Relator's allegations that Sami submitted claims to the Illinois government.

employee of the government (*i.e.*, CCHHS),[10] and that at least some portion of CCHHS's payments to Sami were *reimbursed* by federal Medicare and Medicaid programs (or, regarding Relator's IWRPA claim, by funding from Cook County). "Under Medicaid, the state pays health care providers for services rendered to Medicaid recipients, and it is reimbursed for a significant portion of those funds by the federal government after demonstrating compliance with a number of federal regulations." *United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 2005 WL 2667207, at *2 (N.D. Ill. Oct. 17, 2005) (denying a motion to dismiss on presentment grounds where relator alleged that defendants submitted fraudulent claims to the Illinois Department of Public Aid, which was reimbursed by federal Medicare and Medicaid programs); *United States ex rel. West v. Ortho-McNeil Pharm., Inc.*, 2007 WL 2091185, at *2 (N.D. Ill. July 20, 2007) ("[C]laims submitted to state Medicaid agencies are considered claims presented to the federal government and may give rise to liability under the FCA.").

Relator relies on the definition of the word "claim" as defined by the FCA to support his "reimbursement" theory, which includes, in part:

> any request or demand * * * for money * * * presented to an officer, employee, or agent of the United States; or is made to a contractor, grantee, or other recipient, if the money * * * is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money * * * requested or demanded; *or will reimburse such contractor, grantee, or other recipient for any portion of the money * * * requested or demanded*.

31 U.S.C. § 3729(b)(2)(A) (emphasis added). The pre-2009 version of the statute is somewhat narrower, but the relevant language is still the same:

> any request or demand * * * for money * * * which is made to a contractor, grantee, or other recipient if the United States Government provides any portion

---

[10] A private entity that "serve[s] a public function" in the administration of the Medicare program is "an 'officer or employee' of the United States." *Bodimetric Health Servs., Inc. v. Aetna Life & Cas.*, 903 F.2d 480, 487–88 (7th Cir. 1990). As applied here, CCHHS is thus an officer, employee, or agent of the United States for FCA purposes.

of the money * * * demanded, *or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money * * * which is requested or demanded.*

31 U.S.C. § 3729(c) (pre-2009 version) (emphasis added).[11]

Defendants argue that Relator failed to adequately plead that the money CCHHS used to pay for radiopharmaceuticals actually came from (or was reimbursed by) the government. The Court disagrees. Regarding federal funding, Relator alleges that a "majority" of CCHHS's $900 million annual revenue (*i.e.*, more than $450 million) comes from payments for patient care, and that 39 percent of patient revenue comes from Medicare and Medicaid. That means at least $175 million (or 19.5 percent) of CCHHS's annual revenue is paid by (or reimbursed by) federal funding. While Relator does not say specifically what portion (if any) of CCHHS's approximately $2 million annual budget on radiopharmaceuticals is reimbursed by Medicare and Medicaid, Relator provides enough information about CCHHS's relationship to the federal government to allow an inference that at least some of CCHHS's radiopharmaceutical expenditures were reimbursed by federal funding. See *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) ("[T]he particularity requirement of Rule 9(b) must be relaxed

---

[11] As mentioned above, the allegedly fraudulent activity here is likely governed by both the current FCA statute (amended in 2009), and the pre-amendment statute. In briefing their respective motions to dismiss, the parties failed to commit to a particular version of the statute, citing cases that apply both versions and implying that there are no relevant differences here (at least at this stage). One distinction worth noting, however, is Congress's amending of the definition of "claim," which was meant to "clarify and correct erroneous interpretations of the law that were decided in *Allison Engine Co. v. United States ex rel. Sanders*, 128 S.Ct. 2123 (2008), and *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004)." S. Rep. No. 111-10, at 10–11 (2009), reprinted in 2009 U.S.C.C.A.N. 430, 438. The goal of the amendment was to bring within the proscription of the FCA those who submit false claims to non-governmental entities that are funded by or reimbursed by the federal government. See, *e.g.*, *id.* at 11 (clarifying that the amended FCA reaches "all false claims submitted to State administered Medicaid programs"). Importantly, though, even pre-amendment, courts regularly interpreted the FCA to apply to false claims made to Medicare and Medicaid providers. See, *e.g.*, *United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 2005 WL 2667207, at *2 (N.D. Ill. Oct. 17, 2005) ("Indeed, several courts have highlighted the substantial role played by the federal government in its funding and enforcement of Medicare and Medicaid programs, and have found frauds upon such programs to fall squarely within the protections of the FCA.").

where the plaintiff lacks access to all facts necessary to detail his claim.").[12] Furthermore,

Relator is not required at this stage to provide individual patient information to show which

radiopharmaceutical prescriptions were covered by Medicare or Medicaid. See *Goldberg v. Rush*

*Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 817 (N.D. Ill. 2013) ("Whether claims were actually

submitted to Medicare is information that is inaccessible to Relators."); see also *United States ex*

*rel. Geschrey v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 705 (N.D. Ill. 2012) ("In

this circuit, a relator does not need to have actually witnessed the 'specific request for payment'

or to have had access to paperwork submitted to the government." (citing *Lusby*, 570 F.3d at 854

(explaining that it is not "essential for a relator to produce the invoices (and accompanying

representations) at the outset of the suit"))). Accordingly, Relator has met his burden.

### d.      Rule 9(b)

Defendants also seek dismissal of Relator's FCA and IWRPA claims based on a

purported failure to state those claims with the requisite particularity required under Rule 9(b).

The familiar paradigm for assessing the sufficiency of a pleading is to determine whether the

relator spelled out the "who, what, when, where, and how of the fraud.'" *Camasta*, 761 F.3d at

737. Relator's amended complaint accomplishes this feat in spades. The "who" in Relator's story

are the conspiring Defendants, who engaged in a vertical bid-rigging scheme to win CCHHS

contracts for radiopharmaceuticals (that's the "what"). When, where, and how? At various times

and locations preceding the 2008 CCHHS contract bid the co-conspirators met (*e.g.*, at Faisel

Sami's home, and at a nearby restaurant [Am. Compl. 88, ¶¶ 29–30]), at which time CCHHS

insider Dr. Trepashko (a) told Covidien that it wanted to use Sami as a pass-through (knowing

that Sami was not qualified to carry out the terms of the contract) and instructed Covidien's

---

[12] Defendants' presentment argument can be construed as either a Rule 8 or a Rule 9(b) issue. The Court addresses both arguments here, and thus will not revisit this issue in the Rule 9(b) section.

representative, Mr. Giba, to work with Sami, (b) provided Mr. Giba with insider bidding information, and (c) doctored Sami's bid to ensure that Sami would win the contract, which it did. [Am. Compl. 88, ¶¶ 25–31.] Relator alleges that Defendants duplicated their hoax by submitting a similarly fraudulent bid to retain the CCHHS contract in December of 2009.[13] [Am. Compl. 88, ¶ 46.] Relator's allegations exceed the particularity requirements of Rule 9(b).

Defendants also argue—responding to Relator's allegations that Covidien rewarded Dr. Trepashko's role in the conspiracy by wining and dining him and providing him with lucrative speaking engagements [see Am. Compl. 88, ¶ 32]—that Relator failed to allege with sufficient particularity any violation of the federal Anti-Kickback Statute. [See 97, at 21.] This argument was effectively mooted by Relator's endorsement of his fraudulent-inducement theory of liability. Either way, the Court agrees that Relator has failed to state with particularity that Dr. Trepashko violated any anti-kickback statutes, but the Court interprets Relator's allegations regarding kickbacks [see Am. Compl. 88, ¶ 32] as rhetorical information to explain why Dr. Trepashko elected to devise and participate in this scheme.

### e.    Co-Conspirator Liability

While it's clear that Relator has stated a claim against Sami under his fraud-in-the-inducement theory, the next question is whether Relator's theory extends to Covidien, Mr. Giba, and Dr. Trepashko. Relator advances two arguments to bring these remaining Defendants into the fold: (1) that they are directly liable for causing the submission of the false claims and

---

[13] Defendants argue that Relator should be required to plead the who, what, where, when, and why regarding the fraud leading up to the 2010 contract, as Relator did in connection with the 2008 contract. But this misconstrues Relator's allegations. Relator claims that Defendants' fraudulent scheme arose prior to the 2008 contract, and Defendants merely duplicated (or continued) that scheme in obtaining the 2010 contract. Relator distinguishes these contracts with the 2011 contract, where CCHHS implemented a new bidding system, thus requiring Defendants to devise and implement a new fraudulent scheme to win that contract (and thus requiring Relator to set forth with particularity the details of that new scheme).

statements, and (2) that they are liable as co-conspirators under 31 U.S.C. § 3729(a)(1)(C) and 740 ILCS 175/3(a)(1)(C).[14]

As to the former theory, Relator contends that FCA liability extends to those persons or entities that knowingly assisted in the submission of a false claim to the government. See, *e.g.*, *Marcus*, 317 U.S. at 544–45 ("These [FCA] provisions, considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud * * *."); *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 116 (D.D.C. 2003) ("The False Claims Act extends beyond the person making a false claim to one who engages in a fraudulent course of conduct that induces payment by the government."); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 715 (10th Cir. 2006) (finding direct FCA liability for those who took critical actions in furtherance of the fraud); *United States ex rel. Tran v. Computer Sciences Corp.*, 2014 WL 2989948, at *14–15 (D.D.C. July 3, 2014) (citing cases); *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 90 (D. Conn. 2006) (holding that a relator must allege "knowing assistance" or "cooperation" to survive a motion to dismiss); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004) (applying the "knowingly assisted" standard as articulated in *Marcus*).

---

[14] There is a question as to whether Relator's claims related to the 2008 and 2010 CCHHS contracts apply to Defendant Triad Isotopes. In his Amended Complaint, Relator alleges in Counts I and II that *all* Defendants violated the FCA and the IWRPA with regards to the 2008 and 2010 CCHHS contracts. However, Relator also alleges that CCHHS awarded the later of the two contracts (*i.e.*, the 2010 contract) to Sami on February 19, 2010, which was four months before Defendant Triad Isotopes completed its acquisition of Covidien's radiopharmacy business. [Am. Compl., 88, ¶¶ 17, 48.] Relator does not allege that Triad Isotopes participated in any of the allegedly fraudulent bidding practices related to these contracts, or that Triad Isotopes assumed any preexisting liabilities of Covidien. In responding to Triad Isotopes' motion to dismiss, Relator agreed to dismiss Triad Isotopes from Counts I and II, but requested that the dismissal be without prejudice in the event that discovery reveals a basis for liability. The Court agrees and dismisses Defendant Triad Isotopes from Counts I and II without prejudice.

Because the "false claims" here are actually predicated on the underlying fraudulent inducement of the contracts, the Court looks to whether Relator alleged that each Defendant played a role in the causal chain leading up to the actual inducement, which they all did. Specifically, Dr. Trepashko was the driving force behind the scheme, providing insider information to Covidien and Sami about the bidding process (and allegedly received kickbacks in return); Covidien and Mr. Giba worked with Dr. Trepashko and Sami to prepare the fraudulent bids; and Sami submitted the bids (and the invoices derived from those bids). This is more than a simple conspiracy, as each Defendant played a specific role in forwarding the allegedly fraudulent bids, and their actions were substantial factors in causing Sami's submission of the false bid and the subsequent false claims.

As to the latter theory, Defendants argue that Relator "fails to plead any facts whatsoever supporting an actionable conspiracy." [97, at 23.] This is a bold (and inaccurate) bit of hyperbole. The FCA confers liability on those who "conspire to commit a violation" of the FCA. 31 U.S.C. § 3729(C); see also 31 U.S.C. § 3729(a)(3) (pre-2009) (conferring liability on those who "conspire[] to defraud the Government by getting a false or fraudulent claim allowed or paid"). Arguably this is a lower threshold that the direct-liability showing just discussed, pursuant to which Relator had to plead that each Defendant "knowingly assisted" in the furtherance of the fraudulent scheme. But unique to a conspiracy claim, Relator must establish that the conspirators "agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 673 (2008). The Court has covered this point already, noting that the thrust of the scheme was to construct a collection of knowing misrepresentations with the sole purpose of procuring the CCHHS radiopharmaceutical

contracts. Relator alleged that each misrepresentation was material, and this allegation makes sense, for why else would the parties include the misrepresentations in the bid but-for their impact on winning the bid? Whether any of these allegations is true remains to be seen, but Relator has more than adequately pled a conspiracy among these Defendants.

These allegations are also sufficiently particular so as to satisfy the requirements of Rule 9(b). See *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (noting that claims premised on a course of fraudulent conduct are subject to Rule 9(b)'s particularity requirement). Unlike the relator in *Goldberg v. Rush University Medical Center*, Relator here provided more than conclusory allegations of conspiracy, going beyond just the "who" and the "what" by referencing actual instances where the alleged co-conspirators met to devise their scheme (*e.g.*, at Faisel Sami's home, and at a nearby restaurant [Am. Compl. 88, ¶¶ 29–30]). *Goldberg*, 929 F. Supp. 2d at 825. Perhaps most importantly, Relator alleges in detail the "how" of the story, describing the various misrepresentations that the conspirators ginned up to put Sami in the pole position for securing the contracts. Cognizant of the "great harm to the reputation of a business" that a fraud lawsuit can bring, see *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation omitted), the Court nonetheless finds that Relator has engaged in sufficient pre-complaint investigation so as to present a particularized and plausible complaint adequate to allow Relator to proceed beyond the motion-to-dismiss stage.

### 2. The 2011 Contract

The Court addresses Relator's FCA and IWRPA claims regarding the 2011 CCHHS contract (*i.e.*, Counts III and IV in the amended complaint) separately based on several factual distinctions that distinguish the 2011 contract from the 2008 and 2010 contracts. First, because Triad Isotopes had acquired Covidien's radiopharmaceutical business by that time, Relator

dropped Covidien from Counts III and IV and replaced it with Triad Isotopes. In addition, CCHHS implemented a new electronic bidding process for the 2011 contract, requiring Defendants to tweak their tactics in order to continue their conspiracy (including dropping Sami as part of the conspiracy), and consequently Relator dropped Sami from Counts III and IV. More specifically, Relator alleges that Dr. Trepashko and Mr. Giba (a Triad Isotopes employee post-acquisition) rigged the bid form for the 2011 contract so that it included high quantities of expensive drugs that CCHHS was unlikely to use. To complete the ruse, Triad Isotopes submitted impossibly low bids for these expensive drugs (while submitting artificially high prices on the more common drugs), giving Triad Isotopes the lowest overall bid and thus allowing it to win the contract. Relator alleges that absent this fraudulent scheme, Hot Shots would have been the low bidder and thus would have won the 2011 CCHHS contract and saved CCHHS at least $300,000.

While the facts surrounding the 2011 contract differ from the 2008 and 2010 schemes, the legal principles governing the associated FCA and IWRPA claims are the same. Relator again pursues liability under a fraudulent-inducement theory, arguing that because the 2011 contract was fraudulently induced (through the presentation of artificially low numbers pursuant to the vertical bid-rigging scheme between Dr. Trepashko, Mr. Giba, and Triad Isotopes), all subsequent invoices submitted from Triad Isotopes to CCHHS were tainted with that fraud and therefore qualify as false statements made to the government for payment. Relator's presentment argument is also the same, in that CCHHS continued to receive federal funding from Medicare and Medicaid and state funding from Cook County. As such, any duplicate arguments that Triad Isotopes makes regarding these issues fail for the same reasons that Defendants' arguments failed relating to the 2008 and 2010 contracts.

Triad Isotopes does advance two unique theories for dismissal of Counts III and IV, neither of which is persuasive. First, Triad Isotopes argues that Relator failed to provide examples of any allegedly false claims. [100, at 14.] But (a) based on a fraudulent-inducement theory, *all* invoices submitted pursuant to the underlying fraudulent contract are false claims, and (b) Relator need not provide this information anyway. See *Lusby*, 570 F.3d at 854 (explaining that it is not "essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit"). Second, Triad Isotopes argues that Relator failed to allege an actionable bid-rigging scheme that could give rise to liability under the FCA or IWRPA. But whether Defendants' conduct surrounding the 2011 contract is more accurately described as a government agency exercising its discretion or a conspiracy to defraud the government is a fact issue that is off-limits at this stage in the litigation. Relator *alleged* a plausible bid-rigging scheme (with particularity), and that is all that is required to defeat a motion to dismiss. See, *e.g.*, *United States ex rel. McGee v. IBM Corp.*, 2015 WL 877458, at *12 (N.D. Ill. Feb. 26, 2015) ("[T]he Seventh Circuit has recognized bid-rigging as a basis for an FCA violation." (citing *United States v. Azzarelli Const. Co.*, 647 F.2d 757 (7th Cir. 1981))); *id.* at *11 ("Courts in this district have recognized false inducement as a basis for alleging an FCA violation." (citing *United States ex rel. Danielides v. Northrop Grumman Sys. Corp.*, 2014 WL 5420271, at *5 (N.D. Ill. Oct. 23, 2014))).

Finally, Dr. Trepashko argues that (a) Relator failed to plead that Dr. Trepashko had any personal involvement in the submission of false claims to the government such that he should not be held directly liable for any FCA violations, and (b) Relator failed to plead that Dr. Trepashko played a role in any conspiracy to defraud the government.[15] [95, at 13–16.] Dr. Trepashko's

---

[15] Triad Isotopes and Mr. Giba do not object to Relator's conspiracy allegations.

arguments fail for the same reasons that Defendants' similar arguments failed regarding the 2008 and 2010 contracts. In short, as to the former argument, Relator alleged that Dr. Trepashko knowingly assisted his co-Defendants in inducing CCHHS into contracting with Triad Isotopes (*i.e.*, knowingly assisting Triad Isotopes in furthering the fraud via his doctoring of the bid form), and that is sufficient to state a claim under 31 U.S.C. § 3729(a)(1)(A) or (B). To the latter argument, Relator provided a detailed account of the conspiracy surrounding the 2011 CCHHS contract, stating who was involved and exactly how they devised to rig the bidding process, including names of individuals who can allegedly corroborate these allegations, and the material misrepresentations that they concocted to ensure that Triad Isotopes won the contract. [See Am. Compl., 88, ¶¶ 60–64.] Relator sufficiently stated a claim of conspiracy amongst Triad Isotopes, Mr. Giba, and Dr. Trepashko regarding the 2011 CCHHS contract.

### B.    Antitrust Claims

The Sherman Act exists to protect consumers from injury that results from anticompetitive behavior. See *Banks v. NCAA*, 977 F.2d 1081, 1087 (7th Cir. 1992). The successful pleading of a claim under § 1 of the Sherman Act "requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993).

Regarding the second element, where, as here, the alleged anticompetitive conduct does not amount to a *per se* violation of the Sherman Act, courts assess the defendants' conduct under the Rule of Reason analysis,[16] under which "the factfinder weighs all of the circumstances of a

---

[16] Defendants allege that the vertical bid-rigging allegation here should be analyzed under the Rule of Reason, which Plaintiff Hot Shots does not dispute. The Court agrees with Defendants. See *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 881 (2007) ("[V]ertical price restraints are to be judged by the rule of reason.").

case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin*, 551 U.S. at 885; see also *FTC v. In. Fed'n of Dentists*, 476 U.S. 447, 458 (1986) ("'[The] test of legality [under the Rule of Reason] is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'" (quoting *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918))). The Rule of Reason "requires not only that the plaintiff allege and prove anticompetitive effects, but additionally, as with all antitrust claims, that the injury complained of be of a type that the antitrust laws were designed to guard against, and further that the antitrust violation be the direct cause of plaintiff's injury." *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 556 (7th Cir. 1980) (citations omitted). More specifically, a plaintiff must show that the defendants' conduct had an anticompetitive effect in a relevant market, and that the defendants have market power in that market. *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004); see also *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[T]he plaintiff must allege, not only an injury to himself, but an injury to the market as well."). Finally, a plaintiff must also establish "antitrust standing" to raise an antitrust claim (*i.e.*, whether a party injured by an antitrust violation may recover under the antitrust laws), which is an inquiry separate and apart from whether a plaintiff has Article III standing. See *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*ACG*").

In Counts V and VI of the amended complaint, Plaintiff Hot Shots alleges that Defendants Triad Isotopes, Mr. Giba, and Dr. Trepashko conspired to rig the bidding process for the 2011 CCHHS radiopharmaceutical contract to ensure that CCHHS awarded the contract to Triad Isotopes (and thus not to Hot Shots, who was the second-lowest bidder for the contract), in

violation of state and federal antitrust laws. Defendants moved to dismiss Hot Shots' claims, arguing that (1) Hot Shots failed to allege harm in a relevant market as required under the Rule of Reason, (2) Hot Shots failed to plead an antitrust injury to support antitrust standing, (3) vertical bid-rigging conspiracies are *per se* invalid where the plaintiff was not the low bidder, and (4) Hot Shots lacks antitrust standing. The Court reviews each argument in turn.

### 1.        Injury in a Relevant Market and Triad Isotopes' Market Power

"The first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries (lower output and the associated welfare losses) that matter under the federal antitrust laws." *Menasha*, 354 F.3d at 663.[17] Because the antitrust laws do "not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce," *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945), plaintiffs must allege that the anticompetitive conduct at issue actually impacted competition in a relevant market; "a loss by the plaintiff of a single contract with a single purchaser is simply not equivalent to a deleterious effect on the market." *Havoco*, 626 F.2d at 558. "Otherwise the mere fact that one party bid successfully against another party for a contract would be equivalent to an anticompetitive effect and would raise the specter of an antitrust action being used as a remedy for any tortious conduct during the course of the competition." *Id.* A plaintiff must also show that the defendant has market power in the relevant market, which means that "it can raise prices above a competitive level without losing its business." See *42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401, 404 (7th Cir. 2002). The plaintiff bears the burden to define the relevant market and to establish the defendants' market power. *Spectrum Sports v. McQuillan*,

---

[17] A relevant market is comprised of those "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). "In making this determination, the trier must decide whether the product is unique or has close substitutes, as to which there are substantial cross-elasticities of demand." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986).

506 U.S. 447, 455 (1993). If the plaintiff meets this burden, "the defendant can show that the restraint in question actually has a procompetitive effect on balance, while the plaintiff can dispute this claim or show that the restraint in question is not reasonably necessary to achieve the procompetitive objective." *Agnew*, 683 F.3d at 335–36.

The relevant market here, according to Hot Shots, is the Chicago-area marketplace for radiopharmaceuticals. Regarding the market impact of Defendants' allegedly anticompetitive behavior, Hot Shots argues that the lucrative 2011 CCHHS contract—covering $1.6 million in sales of radiopharmaceuticals—provided windfall profits to a single provider in the Chicago-area market (Triad Isotopes) whilst simultaneously locking out other market participants (Hot Shots and Cardinal Health), thereby dampening the competitiveness of the radiopharmaceutical market throughout Chicagoland. [See Am. Compl. 88, ¶ 95 ("Pursuant to their unlawful conspiracy, Defendants have reduced competition among providers of radiopharmaceutical services in the Chicago-area market by preventing legitimate low-cost bidders such as Plaintiff from competing equally for the CCHHS radiopharmaceutical contract and thereby depriving them of the opportunity to win the contract.").]

The Court is not persuaded. Simply put, Hot Shots cannot escape the Seventh Circuit's holding that "a loss by the plaintiff of a single contract with a single purchaser is simply not equivalent to a deleterious effect on the market." *Havoco*, 626 F.2d at 558; see also *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984) (noting that "it is the function of § 1 to compensate the unfortunate only when their demise is accompanied by a generalized injury to the market"). While Defendants' actions clearly had an anticompetitive effect, that effect extended only to a single (albeit substantial) contract. Hot Shots fails to explain how Defendants' actions with regards to the 2011 CCHHS contract impacted any other

participants or any other contracts in the Chicagoland radiopharmaceutical market. Even under the generous Rule 8(a) notice-pleading standard, Hot Shots' complaint cannot be construed to allege a deleterious impact on the market. Instead, Hot Shots clearly states that Defendants' anticompetitive conduct affected only one contract: "Defendants have reduced competition in the Chicago-area market by preventing legitimate low-cost bidders such as Plaintiff from competing equally *for the CCHHS radiopharmaceutical contract*." [Am. Compl. 88, ¶ 95 (emphasis added).] The Seventh Circuit affirmed the dismissal of an antitrust claim under similar circumstances in *Havoco*, noting that while the complaint "detail[ed] a scenario of unsavory and reprehensible business practices," the plaintiff nonetheless failed to state a claim for relief under the Sherman Act. *Havoco*, 626 F.2d at 559. Such is the case here. While the bid-rigging allegations here are distasteful, Plaintiff fails to plead enough facts to plausibly explain how Defendants' conduct impacted the relevant market, thus putting Hot Shots' claim beyond the bounds of the Sherman Act.[18]

### 2. Antitrust Injury

The concept of "antitrust injury" has both a ubiquitous and amorphous presence in antitrust jurisprudence, and can be found (1) as a *prima facie* element of Sherman Act claims, (2) as a factor under the Rule of Reason analysis, and (3) as a factor in the determining whether a plaintiff has "antitrust standing." See, *e.g.*, *Denny's Marina*, 8 F.3d at 1220 (listing "antitrust injury" as a necessary element of a Sherman Act claim); *Atl. Richfield Co. v. USA Petro. Co.*, 495 U.S. 328, 334 (1990) (noting that a showing of "antitrust standing" is required in both *per se*

---

[18] Hot Shots does not explicitly plead that Triad Isotopes has market power in the Chicago-area radiopharmaceutical market, but Hot Shots does allege that Triad Isotopes obtained the 2011 CCHHS contract despite not having the lowest "actual" bid, implying that Triad Isotopes can "raise prices above a competitive level without losing its business." See *42nd Parallel North*, 286 F.3d at 404. Because Hot Shots failed to establish that Defendants' conduct impacted a relevant market, the Court need not decide whether Plaintiff met its burden to show that Triad Isotopes had market power in the relevant market.

and Rule of Reason cases); *Havoco*, 626 F.2d at 556 (same in the Rule of Reason context); *AGC*, 459 U.S. at 538 (listing antitrust injury as one of several nondispositive factors for assessing "antitrust standing"). But regardless of its contextual surroundings, the "antitrust injury" inquiry always remains relatively the same:

> [Plaintiffs] must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations * * * would be likely to cause.

*Brunswick Corp.*, 429 U.S. at 489 (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969)); see also *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993); *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) ("[A plaintiff] must demonstrate that her 'claimed injuries are 'of the type the antitrust laws were intended to prevent' and 'reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.'" (quoting *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1031 (7th Cir. 2006))).

The Achilles' heel for most vertical bid-rigging conspiracies with regards to antitrust injury is the fact that the conspiracy actually *increases* competition such that plaintiffs' injuries are not of the type that the antitrust laws were meant to prevent. Such was the case in *James Cape & Sons*, where the defendants in a bid-rigging scheme had insider knowledge of their competitors' bids, allowing them to lower their bids to ensure victory, such that "their bid-rigging activities actually *increased*, rather than restricted, competition, albeit in an illegal manner." *James Cape & Sons v. PCC Const.*, 453 F.3d 396, 399 (7th Cir. 2006). But Hot Shots doesn't have this problem. Instead, Hot Shots alleges that the conspirators rigged the RFP in such a way that Triad Isotopes was actually the highest bidder, even though on paper it appeared

to be the lowest. Thus, the bid-rigging activities here genuinely did decrease competition (and increase prices to the consumer—here, CCHHS), meaning that Hot Shots' injury is related to CCHHS's injury, and those injuries are precisely the sort of injuries that the antitrust laws were meant to prevent. See, *e.g.*, *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) (noting that to establish antitrust injury a plaintiff must show "that its loss comes from acts that reduce output *or raise prices to consumers*" (emphasis added)).

Somewhat relatedly, Defendants argue that Hot Shots failed to plead antitrust injury because its purported injury—*i.e.*, lost profits from its failure to secure the 2011 CCHHS contract—is not the type of injury that the antitrust laws were intended to prevent. See, *e.g.*, *Brunswick*, 429 U.S. at 488 ("The antitrust laws * * * were enacted for 'the protection of competition not competitors.'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962))); *Atl. Richfield Co.*, 495 U.S. at 342 ("The purpose of the antitrust injury requirement is * * * [to] ensure that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place * * *."); *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996) ("Over and over, we stress that antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business."). To be sure, this argument is cut from the same cloth as Defendants' argument regarding Hot Shots' failure to allege an anticompetitive effect in a relevant market. But the Court is careful not to conflate these two inquiries. The real problem with Hot Shots' allegation is its lack of an anticompetitive impact *on a relevant market*, not its anticompetitive nature in general. The Court cannot overlook the fact that Defendants' alleged behavior did have an anticompetitive impact on at least one consumer. And were Hot Shots able to remedy its pleading deficiency as to the market impact of

Defendants' anticompetitive conduct, its complaint would not fail due to a lack of antitrust injury.[19]

### 3.    Vertical Bid-Rigging Conspiracies

Defendants argue that bid-rigging conspiracies are not actionable under the Sherman Act where the contract at issue is awarded to the lowest bidder. [See, *e.g.*, 100, at 20 (citing *Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336, 343–48 (6th Cir. 2006).] The Court disagrees with Defendants that there is a categorical ban on such cases. The legal principle motivating the court in *Expert Masonry*—the only case that Defendants cite in support of their argument—is that buyers are free to buy from whomever they choose, and courts are not fit to second-guess such business judgments. *Expert Masonry* realizes that "salesmen battle and strive to curry favor and close the deal," and "whether the parties exercise wise business judgment in any given transaction is not a concern of the antitrust laws." *Id.* at 347. And "[t]o allow any auction, bidding, or other competitive sales process to be challenged whenever one potential supplier is distraught because it did not win the sale would be to outlaw competition and salesmanship, for companies and their staffs could not reasonably be expected to compete to win sales, projects,

---

[19] Also unpersuasive is Defendant Trepashko's argument that Hot Shots failed to plead the causation component of antitrust injury. See *Greater Rockford Energy*, 998 F.2d at 395 (noting that "[a]ntitrust injury involves a causation requirement"). Defendant's argument hinges on a literal interpretation of Hot Shots' allegation that it "had the lowest overall bid among the *legitimate* bidders," [Am. Compl., 88, at ¶ 69 (emphasis added)], and Defendant claims ignorance as to what Hot Shots means to imply with this "arbitrary, qualifying language." [95, at 10.] But read in context of the complaint as a whole, the clear inference is that Triad Isotopes is the "illegitimate" bidder, meaning that but-for Defendants' rigging of the RFP, Hot Shots would have been the lowest bidder, and thus would have won the 2011 contract. Defendant Triad Isotopes also argues that "Hot Shots does not allege any *facts* to show that its lost profits resulted from the alleged reduction in competition." [100, at 23–24.] This is not true. Hot Shots alleges that (1) Dr. Trepashko and Mr. Giba worked together to change the expected quantities for various drugs in the RFP to ensure that Triad Isotopes would have the lowest bid among all bidders (which included Hot Shots), and (2) if the drug usage amounts in the RFP reflected actual usage instead of the deliberately skewed usage, Hot Shots' bid—which was the second-lowest overall—would have been approximately $300,000 less than Triad Isotopes' bid. [Am. Compl., 88, at ¶¶ 64–69.] Hot Shots adequately pled causation.

33

and new clients if, in so doing, they risk treble damages and even imprisonment when even one rival is disappointed with the results." *Id.* at 348–49.

First of all, the decision in *Expert Masonry* is better understood as one involving a plaintiff's failure to identify anticompetitive behavior, and should not be read as a categorical ban on vertical bid-rigging schemes. Regardless, while there are hints of the *Expert Masonry* fact pattern present here (*i.e.*, a distraught seller in a single transaction), the two cases are really quite different. The issue here has nothing to do with CCHHS's freedom to contract with the seller of its choice; of course CCHHS has that freedom, and it would be beyond the Court's bailiwick to question CCHHS's business judgments in that regard. But here, the terms of the 2011 CCHHS radiopharmaceutical RFP eliminated much of CCHHS's discretion by stating that the low bidder would receive the contract. And Hot Shots alleges that (after accounting for the fraudulent usage numbers included in the RFP) *it*, and not Triad Isotopes, was the low bidder. This is anticompetitive behavior, for absent the conspiracy, competition increases. To be sure, the principles articulated in *Expert Masonry* are sounds ones, they just don't translate into the bright-line rule that Defendants' assert here. To put a categorical ban on Defendants' behavior would be contrary to the core mission of the antitrust laws, and for that reason, this argument fails.[20]

### 4. Antitrust Standing and Antitrust Injury

Although the standing provision in § 4 of the Clayton Act is broad—permitting civil suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15—the Supreme Court has endorsed several limiting

---

[20] In a swing-for-the-fences moment, Defendant Trepashko also argues, more fundamentally, that Hot Shots failed to plead direct allegations of a conspiracy. [See 95, at 3–4.] But in addition to its express allegations of conspiracy [Am. Compl. 88, ¶¶ 55, 70], Hot Shots pled a wealth of facts describing the agreement between Triad Isotopes, Mr. Giba, and Dr. Trepashko regarding the 2011 CCHHS contract [*Id.* ¶¶ 9, 60–65], which are consistent with Plaintiffs other allegations regarding the nefarious relationship between these Defendants. [*Id.* ¶¶ 18–19, 25–33.] Hot Shots sufficiently pled a conspiracy.

principles such that not every person, however tangentially injured by an antitrust violator, has standing to sue. See *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472–75 (1982); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.3 (1972) (observing that the lower federal courts were "virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation").

In *AGC*, the Supreme Court incorporated traditional common-law tort principles into the evolving antitrust-standing inquiry, thereby adding "a proximate cause element into § 4 actions [such] that a plaintiff does not have standing to sue under § 4 if its injuries were indirect and speculative." *Greater Rockford Energy & Tech. Corp. v. Shell Oil co.*, 998 F.2d 391, 395 (7th Cir. 1993). The result was a six-factor test for examining the link between a plaintiff's harm and a defendant's wrongdoing that has become the predominant test for assessing antitrust standing, focusing on: (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002) (citing *AGC*, 459 U.S. at 537–45).

### a. Antitrust Injury

Defendants argue that Hot Shots lacks antitrust standing because it failed to state a cognizable "antitrust injury," *i.e.*, a type of injury that Congress sought to redress. Defendants' arguments here do not differ from their other arguments regarding antitrust injury, which the Court has already addressed. The Court need not repeat its analysis here.

### b.     Causation

Defendant Trepashko argues separately that Hot Shots did not plead that the alleged anticompetitive conduct at issue here (*i.e.*, bid rigging) was the "but for" cause of Hot Shots' injury, based on the "tenuous" assumption that Hot Shots would have won the 2011 bidding process but-for the alleged anticompetitive behavior. [See 95, at 12.] While Hot Shots' allegation may be tenuous, it is still sufficient. Indeed, Hot Shots expressly alleged but-for causation: "If the drug usage amounts in the RFP reflected actual usage instead of the deliberately skewed usage, Hot Shots' bid * * * which [was] the lowest overall bid among the legitimate bidders * * * would have been approximately $300,000 less than Triad's Bid," and thus Defendants' conspiracy "prevent[ed] Hot Shots * * * from winning the CCHHS contract." [Am. Compl., 88, at ¶¶ 69–70.] Hot Shots sufficiently pled causation.

### c.     Directness

Finally, Defendant Trepashko also argues that Hot Shots fails under the directness inquiry because it failed to plead that the alleged bid-rigging has in fact resulted in increased prices to radiopharmaceutical consumers. [See 95, at 12.] This is a misapplication of the directness inquiry, which is meant to assess the plaintiff's proximity to the harm in comparison to other (actual or potential) plaintiffs, as often contemplated in the direct-purchaser versus indirect-purchaser context. Defendant's argument is really just another way of saying that Hot Shots failed to allege an anticompetitive impact on a relevant market, which the Court has addressed with belt and suspenders at this point.

### 5.     Application to Illinois State Antitrust Law

The Court's antitrust analysis thus far has been solely with regard to Hot Shots' federal antitrust claim (Count V), not Hot Shots' state antitrust claim under Illinois statute 740 ILCS

10/3 (Count VI). The question is whether the Court's analysis under federal law applies to the state-law claim at issue. The parties did not address this issue in their briefs.

Illinois courts have adopted a common-law harmonization provision, meaning that they interpret their antitrust laws in harmony with federal-court decisions interpreting federal antitrust law. See, *e.g.*, *People v. Crawford Distrib. Co.*, 291 N.E.2d 648, 652–53 (Ill. 1972) (noting that federal antitrust precedent is a "useful guide to our court"); *People ex rel. Scott v. College Hills Corp.*, 435 N.E.2d 463, 467 (Ill. 1982) ("Federal precedent is both relevant and helpful in determining the adequacy of antitrust allegations."). While federal precedent is not binding on Illinois courts, the relevant statutes are very similar, and the Court has not identified any case law indicating that the Illinois Supreme Court would differ in any way from the analysis set forth herein.[21] See, *e.g.*, *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1158 (Ill. App. Ct. 1992) (citing federal antitrust law in defining "antitrust injury"); *Intercontinental Parts, Inc. v. Caterpillar, Inc.*, 631 N.E.2d 1258, 1268 (Ill. Ct. App. 1994) (citing federal law in assessing the market-power requirement); see also *Holzrichter v. Yorath*, 987 N.E.2d 1, 27–29 (Ill. Ct. App. 2013).

The only potential hiccup in this inquiry relates to the Court's antitrust-standing analysis under the *AGC* six-factor test. The problem is that *AGC* was derivative of an earlier antitrust-standing opinion (*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)) that multiple state legislatures—including the Illinois legislature—repealed (in what have come to be known as *Illinois Brick* repealer statutes). See 740 ILCS 10/7. The question, then, is whether Illinois' *Illinois Brick* repealer statute (which repealed one antitrust-standing opinion) would motivate

---

[21] In interpreting state statutes, the Court looks to decisions from the state's highest court for guidance. See *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994). "In the absence of guiding decisions by the state's highest court, [federal courts] consult and follow the decisions of intermediate [state] appellate courts unless there is a convincing reason to predict [that] the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012).

Illinois courts to decline to follow *AGC* (a subsequent antitrust-standing opinion). While the Illinois Supreme Court has yet to decide the issue, the Illinois Appellate Court has cited *AGC* approvingly, see *County of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1045 (Ill. App. Ct. 2004), and the Seventh Circuit has stated affirmatively that federal antitrust standing rules apply under the Illinois Antitrust Act. *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1066 (7th Cir. 1997). Thus, the Court sees no reason why the Illinois Supreme Court would not follow *AGC*. However, because the Court rejected Defendants' antitrust-standing arguments, the issue is simply academic at this point.

Because the Court finds that the Illinois Supreme Court would interpret its antitrust statute consistent with this Court's interpretation of federal antitrust law, Hot Shots' state-law antitrust claim fails for the same reasons that its federal antitrust claim fails. Thus, the Court must dismiss both Count V and Count VI of Plaintiffs' amended complaint.

### C. Tortious Interference with Prospective Business Claim

In addition to its state and federal antitrust claims, Hot Shots also makes a tortious interference claim against the Trepashko–Giba–Triad Isotopes group of defendants regarding their role in the 2011 CCHHS radiopharmaceutical bid process. Specifically, Hot Shots argues that, through their purposeful manipulation of the RFP, Defendants intentionally interfered to prevent Hot Shots' legitimate expectancy of entering into a contractual relationship with CCHHS from ripening. [Am. Compl. 88, ¶¶ 107–111.]

Under Illinois law, the elements of a claim for tortious interference with prospective business relations are "(1) plaintiff's reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of that expectancy; (3) defendant's intentional and unjustifiable interference that induced or caused a breach or termination of the expectancy; and

(4) damage to plaintiff resulting from defendant's conduct." *F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 800 (7th Cir. 2007) (citing *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1133–34 (Ill. 2001)); *Botvinick v. Rush Univ. Med. Center*, 574 F.3d 414, 417 (7th Cir. 2009).

Hot Shots stumbles out of the gate. Because this was a blind bid (*i.e.*, where all bidders submitted anonymous bids), all competitors theoretically had an equal expectancy of winning the contract. Hot Shots alleges that it was a "highly qualified bidder," but that allegation alone is insufficient to allow the Court to infer that Hot Shots expected to win the contract. And Hot Shots' allegation that it ultimately had the lowest "legitimate" bid is also unavailing, as this is an *ex post* observation that says nothing of Hot Shots' pre-bid expectations. Because this was a blind bidding process where the contract would go to the lowest bidder, Hot Shots has a tough row to hoe to establish an *ex ante* expectancy of winning—perhaps if Hot Shots had a long history of underbidding its competitors (which presupposes that Hot Shots knew who its competitors were pre-bid), or if Hot Shots had been the only bidder. Clearly Hot Shots had a reasonable expectancy of entering into *a fair bidding process*, but this is not the same as a reasonable expectancy of entering into *a business relationship*. And while Hot Shots was surely hopeful of winning the contract, it must show "more than a mere hope" to establish a tortious interference, and Hot Shots failed to plead any basis for its expectation of success. See, *e.g.*, *Quadro Enters., Inc. v. Avery Dennison Corp.*, 2000 WL 1029176, at *10 (N.D. Ill. July 26, 2000) ("The fact that [plaintiff] was asked to bid implies that the contract was up for competitive bidding and thus it cannot be said that [plaintiff] had an expectancy of future business relations."). Even at the pleading stage, Hot Shots threadbare allegations are insufficient to state a claim, thus requiring dismissal. See *Del Monte Fresh Produce, N.A., Inc. v. Kinnavy*, 2010 WL 1172565, at *6 (N.D. Ill. Mar. 22, 2010) ("*Twombly* does require that [plaintiff] set forth facts

that make it plausible that she had a reasonable expectancy * * *."); *Huon v. Breaking Media, LLC*, 2014 WL 6845866, at *16 (N.D. Ill. Dec. 4, 2014) (same); *Myers v. Phillips Chevrolet, Inc.*, 2004 WL 2403126, at *3–4 (N.D. Ill. Oct. 26, 2004) (same); *Emery v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 2003 WL 22176077, at *10 (N.D. Ill. Sept. 18, 2003) (same).

## IV.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss [94, 96, 99, 102, 103] are denied as to Counts I–IV and granted as to Counts V–VII. Counts V–VII of the amended complaint are dismissed without prejudice. Relator and Plaintiff should inform the court within 14 days as to whether they intend to file a second amended complaint repleading Counts V–VII, at which time the Court will set a status hearing to discuss scheduling moving forward.


Dated: May 15, 2015

_____
Robert M. Dow, Jr.
United States District Judge